MID–SHIAWASSEE COUNTY CONCERNED CITIZENS, Plaintiff,

v.

Russell E. TRAIN, Administrator of the United States Environmental Protection Agency, and Howard E. Tanner, Director of the Michigan Department of Natural Resources, Defendants.

Civ. A. Nos. 5–40016 and 5–71876.

United States District Court,
E. D. Michigan, S. D.

Jan. 23, 1976.

Clark Shanahan, Shanahan & Scheid, Owosso, Mich., for Mid-Shiawassee.

Gilbert Gove, Miller, Canfield, Paddock & Stone, Detroit, Mich., for City of Owosso.

Thomas M. Woods, Asst. U. S. Atty., Detroit, Mich., for E.P.A.

Thomas J. Emery, Asst. Atty. Gen., Lansing, Mich., for Dept., of Natural Resources.

## OPINION AND ORDER

JOINER, District Judge.

This is an action by a citizens' group to force defendants to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.*, and the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251 *et seq.*, as well as various state laws in their approval of federal and state grant assistance for the construction of a physical-chemical waste water treatment facility to be located in the City of Owosso, Michigan. Jurisdiction lies under the Administrative Procedure Act, 5 U.S.C. § 701.

Plaintiffs' lawsuit is directed at the defendants' failure to require the City of Owosso to buttress its grant application with a full environmental impact statement (EIS). Instead, defendant Train, after an examination of the grant application, supporting environmental assessments of the proposed project, and results of public hearings issued a "negative declaration" and an appraisal concluding that the Owosso project would not significantly affect the quality of the human environment to a degree necessitating the preparation of an EIS.

Plaintiff charges that Owosso's federal grant application, which proposes to construct a waste water treatment plant utilizing a physical-chemical mode of treatment, fails to objectively disclose known environmental consequences and to explore alternative courses of action as required by NEPA. Plaintiff also alleges that the application misrepresented a land treatment alternative advocated by plaintiff and that the consulting engineers hired by Owosso to prepare an environmental assessment for the project were biased against land treatment.

* * * * * *

Based upon the administrative record underpinning EPA's issuance of the negative declaration, the defendants have moved to dismiss the complaint or in the alternative for summary judgment on the ground that EPA's decision was not arbitrary or capricious. Plaintiff opposes the motion and urges that summary judgment is inappropriate because of material issues of fact raised in an affidavit executed by plaintiff's counsel and because plaintiff has not yet had an opportunity to conduct necessary discovery.

Defendants' motions raise two primary issues: (1) whether assertions in counsel's affidavit about bias in the selection of a physical-chemical mode of treatment over a land treatment alternative and statements indicating a difference in scientific opinion over the merits of physical-chemical as opposed to land treatment give rise to material disputes of fact which prohibit summary judgment; and (2) whether, assuming that summary judgment is proper, the administrator's decision not to require Owosso to prepare an EIS was arbitrary or capricious. These motions also raise subsidiary issues concerning the appropriate standard of review in this type of case as well as the integrity of the administrative record when it is offered in support of a motion for summary judgment.

For the reasons which follow, the court holds that counsel's affidavit and plea for further discovery do not preclude summary judgment, that EPA's issuance of a negative declaration with regard to Owosso's grant application was not arbitrary or capricious, and that DNR's approval of a state grant and issuance of construction permits on the Owosso project violates neither federal nor state law.

\* \* \* \* \* \*

### Standards Governing Judicial Review of Agency Action

■ NEPA requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Where, as here, the responsi-ble federal agency concludes that an EIS is not required, that agency must issue a "negative declaration" supported by an "environmental impact appraisal" on the proposed action. 40 C.F.R. 6.212 (1975).

■ Courts have applied two different standards of review under the Administrative Procedure Act to an agency's factual determination that an impact statement is not required. Some courts hold that an agency's findings may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See, e. g., First National Bank of Chicago v. Richardson, 484 F.2d 1369, 1373 (7th Cir. 1973); Hanly v. Kliendienst, 471 F.2d 823, 829 (2d Cir. 1972); Smith v. City of Cookeville, 381 F.Supp. 100, 111 (M.D. Tenn.1974). Other courts hold that a federal agency's decision not to require an EIS should be tested by a "reasonableness" standard. See, e. g., Hiram Clarke Civic Club v. Lynn, 476 F.2d 421, 425 (5th Cir. 1973); Simmans v. Grant, 370 F.Supp. 5, 12 (S.D.Tex.1974). In the absence of a specific directive from this circuit, the court concludes that the "arbitrary or capricious" standard is appropriate in this case. See Citizens To Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ Regardless of the standard of review applied to an agency's factual findings, the agency should affirmatively develop a reviewable record for the court and its legal determination of "significance" ("actions significantly affecting the quality of the human environment") is subject to de novo review. See, e. g., First National Bank of Chicago v. Richardson, supra, at 1373; Simmans v. Grant, supra, at 17. The best exposition of the applicable test comes from Hanly v. Kliendienst, supra :

"[I]n deciding whether a major federal action will 'significantly' affect the quality of the human environment the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which

the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area. . . ." 471 F.2d at 830–31. The fifth circuit has observed that attention must also be focused on the possibility of some "significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all.)" *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir. 1973).

▪ EPA's own regulations outline the procedures applicable to issuance of a negative declaration. First, the grantee must submit an "environmental assessment" of the proposed project. Second, EPA must conduct an "environmental review" to determine whether the proposed action may have a significant impact upon the environment. Third, if EPA concludes that an EIS is not required, it must issue a "negative declaration" to that effect, supported by an "Environmental Impact Appraisal" which describes the basis for the agency's conclusion that no EIS is required. *See* 40 C.F.R. § 6.200 *et seq.* (1975).

▪ In effect NEPA and the Regulations contemplate that a grantee prepare a "mini EIS", a product of consultation with appropriate agencies and authorities, although not in the detail required of an impact statement. *See Hanly v. Kliendienst, supra,* at 832; *Simmans v. Grant, supra,* at 17. Thus, the grantee's environmental assessment should reflect a systematic, interdisciplinary approach to insure that, in deciding not to require an impact statement, no significant environmental factor is overlooked. The reviewing agency, in this case EPA, must identify and develop methods and procedures for review which will give appropriate consideration to presently unquantified environmental amenities, including public input on the

proposed action. Moreover, there must be some consideration and discussion of appropriate alternatives to the project or its more objectionable features. *See* 42 U.S.C. § 4332(A), (B), & (C); *Hanly v. Kliendienst, supra,* at 834–36; *Simmans v. Grant, supra,* at 17–18.

The current procedural posture of this case also warrants some comment. Only one case, *Hiram Clarke Civic Club v. Lynn, supra,* has addressed the problem of the record upon which a court may review an agency's issuance of a negative declaration:

" . . . only if a plaintiff raises substantial environmental issues should a court proceed to examine and weigh the evidence of both the plaintiff and the agency to determine whether the agency reasonably concluded that the particular project would have no effects that would significantly affect our environmental quality. Only if the plaintiff can show an inadequate evidentiary development before the agency should the District Court supplement the deficient administrative record by taking evidence on the environmental impact of the project."

476 F.2d at 425; *see Save Our Ten Acres v. Kreger, supra,* at 467. As noted previously, the defendants have moved to dismiss or in the alternative for summary judgment based upon the "administrative record" compiled by EPA, consisting of the MacMullen affidavit, the Owosso grant agreement and supporting documentation. Under *Hiram Clarke,* it is appropriate for the court to consider whether the material submitted by plaintiff in opposition to the motions raises "substantial environmental issues" or demonstrates "inadequate evidentiary development" such as might preclude summary judgment.

*The Question of Bias on the Part of the Consulting Engineers*

The affidavit submitted by plaintiff's counsel, Clark Shanahan, in opposition to the defendants' motions, purports to at-

tack the integrity of the administrative record upon which EPA based its decision to issue a negative declaration on the Owosso project. Counsel asserts that the study of land treatment was conducted by the same firm, Ayres, Lewis, that had previously recommended adoption of a physical-chemical method of treatment. He asserts that representatives of Ayres, Lewis were reported by July, 1973 minutes of a meeting held by the DNR to have decided against land treatment prior to undertaking a serious study of that alternative and voiced opposition to such study at the June 25, 1973· public hearing.

Counsel also states in his affidavit that he has written documentation indicating scientific opposition to sludge incineration, scientific opinion holding that soil in the Owosso area is suitable for a land disposal method of sewage treatment, and evidence that land disposal was not receiving fair treatment from many engineering consultants.

Oral argument on defendants' motions disclosed that the nub of plaintiff's "bias" assertion was a difference in scientific opinion between plaintiff's experts and Owosso's engineering consultants over two questions: (1) whether soil in the Owosso area was suitable for land treatment and, more importantly, (2) whether use of a land disposal alternative would require as much land as Ayres, Lewis believed it would, a factor directly affecting capital outlay for a land disposal system and triggering widespread community opposition due to displacement of families and confiscation of farmland. Counsel for plaintiff conceded at oral argument that he would have the court choose between the competing scientific theories on these questions if presented with an opportunity to present expert testimony.

 The court concludes that plaintiff's assertions of bias against land treatment on the part of Ayres, Lewis do not raise "substantial environmental issues" or material issues of fact which ought to preclude summary judgment at the outset of this case. EPA, not Owos-

so or its engineering consultants, was the federal agency responsible for grant approval and issuance of the negative declaration. The record in this case, particularly the MacMullen affidavit, indicates that EPA actively participated in Owosso's preparation of the grant application and accompanying environmental assessments and independently reviewed the grant application in the light of NEPA's requirements.

Ayres, Lewis' commitment to a PC treatment process as reflected in the recommendations to Owosso in 1972 and 1973 do not appear to have tainted the environmental assessments prepared for EPA on the project in 1974. As will be examined more closely later in this opinion, Ayres, Lewis prepared a detailed environmental assessment on five alternative courses of action open to the city, among them the land treatment alternative advocated by plaintiff. The September, 1974 assessment was revised once in response to criticisms voiced by EPA. The assessment, as revised in October, 1974, along with accompanying documents comprising the record in this case, constituted a record upon which the decisionmaker could arrive at an informed decision. *See Sierra Club v. Froehlke,* 345 F.Supp. 440, 445 (W.D.Wis. 1972); *Environmental Defense Fund v. Corps. of Engineers,* 342 F.Supp. 1211, 1217 (E.D.Ark.), *aff'd,* 470 F.2d 289 (8th Cir. 1972).

 Ayres, Lewis' recommendation that Owosso adopt the PC method prior to undertaking the environmental assessment which analyzed, among other alternatives, land treatment, does not automatically invalidate the assessment, much less EPA's independent review thereof. Compliance with section 102 of NEPA is based upon good faith objectivity rather than subjective impartiality. *Sierra Club v. Callaway,* 499 F.2d 982, 994 (5th Cir. 1974); *Life of the Land v. Brinegar,* 485 F.2d 460, 467 (9th Cir. 1973); *Environmental Defense Fund v. Corps. of Engineers,* 470 F.2d 289, 296 (8th Cir. 1972). MacMullen himself was aware of plaintiff's charge of bias in ad-

vance of the issuance of the Environmental Impact Appraisal. He asserted that "while the land treatment alternative was evaluated by the same consulting firm that previously recommended a different system, no constraint required a different approach. . . . "

Where the sufficiency of an EIS is at issue, conflicting points of scientific opinion do not give rise to material issues of fact. The court is not to rule on the relative merits of competing scientific opinion but to assure that the statement sets forth the opposing scientific views and does not take the arbitrary and impermissible approach of omitting any reference to the existence of responsible scientific opinion concerning adverse environmental effects. *See Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C. 380, 463 F.2d 783, 787 (1971); *City of North Miami v. Train,* 377 F.Supp. 1264, 1273 (S.D.Fla. 1974). The rule should be no different where a negative declaration is under attack.

Plaintiff's scientific differences with Ayres, Lewis were aired twice in the history of this case, once at the public hearing held June 25, 1973 and again at the public hearing held November 25, 1974. The consulting engineers responded by letter to plaintiff concerning specific questions asked about the PC method at the 1973 hearing. Plaintiff said it would submit, in conjunction with its prepared statement read at the 1974 hearing, the views of Professor Earl Erickson of Michigan State University on the soil suitability of the Owosso area for land treatment. Plaintiff challenged at the 1974 hearing both the land requirements set forth by Ayres, Lewis in its analysis of the land treatment alternative and the firm's cost-effectiveness examination of land treatment.

The record of the hearing demonstrates that the dual purpose of a hearing procedure, enabling the agency to obtain all relevant data and satisfying the community that its views are being considered, was served in this case. *See Hanly v. Kliendienst, supra,* at 835.

Plaintiff's views and the record from which they were derived were before EPA in the course of its review of the Owosso grant application. MacMullen, in conducting his independent review of the Owosso application, was convinced of the cost-effective superiority of PC over land treatment and was also persuaded by: (a) the lack of ready availability of sufficient land; (b) the unsuitable clay content of Owosso land as compared with the sandy Muskegon soil where land treatment is still being tested and evaluated; (c) the incompleteness and inconclusiveness of research results on the Muskegon project; and (d) the ability to use Owosso's present treatment facility and site for expansion of a PC process, a factor not present if land treatment were adopted.

MacMullen also found that the record generated by the grantee demonstrated a reasonable investigation and review, both rigorous and objective, of alternative proposals, including land treatment. Implicit in these findings is EPA's acceptance of the basic scientific assumptions upon which Ayres, Lewis analyzed land treatment and a rejection of plaintiff's challenge to those assumptions. MacMullen, himself an expert in waste water treatment facilities, simply concluded that Ayres, Lewis' analysis of alternatives to the PC process was sound. The court finds no requirement in NEPA, and the parties cite none, indicating that when a grantee and the reviewing agency undertake exploration of alternatives to a proposed project, the alternatives must include "alternatives within alternatives" and must present scientific justification for the basic assumptions upon which analysis proceeds.

Because the record reflects Owosso's good faith, objective presentation of alternatives to the proposed project, the presence of competing views before the decisionmaker, and the decisionmaker's cognizance of those views in his ultimate determination, the court holds that plaintiff's assertions of "bias" on the part of Ayres, Lewis do not preclude consideration of defendants' mo-

tions for summary judgment on the record before the court.

Neither does plaintiff's plea for more time within which to conduct discovery have merit. Plaintiff filed this suit March 7, 1975. Defendant Train answered the complaint with the administrative record and filed his motion on October 15, 1975. Other than directing a few simple interrogatories to defendant Train, largely answered by the record, plaintiff has taken no discovery or presented any evidence other than the affidavit of counsel to substantiate the bias claim in the months preceding argument on the motions in December, 1975.

 This is not a case where supporting affidavits are "unavailable" within the meaning of Rule 56 because of a need for time within which to conduct testing relevant to the action. *See Nielson v. Seaborg,* 348 F.Supp. 1369, 1371 (D.Utah 1972) (summary judgment inappropriate in action to enjoin nuclear testing where evidence of radiation damage takes time to document). As early as June, 1973, plaintiff took a scientific position, supported by experts, in opposition to Ayres, Lewis and EPA. Although plaintiff suspects EPA of bias, it has produced no evidence, and the record discloses none, to indicate EPA's institutional disfavor with land treatment. Suspicion is not the stuff of which opposition to summary judgment is made.

*The Merits of the Negative Declaration*

In support of its grant application, Owosso submitted to EPA an "Environmental Assessment of Proposed Wastewater Collection and Treatment Facilities" compiled by Ayres, Lewis for the subject area in October, 1974. This assessment, designed to meet the first step in the negative declaration procedure, examined five alternatives for sewage treatment: (1) two stage activated sludge with tertiary carbon absorption; (2) two stage activated sludge with tertiary sand filtration; (3) land disposal; (4) PC with chlorination-dechlorination; and (5) no change in the present facilities.

The consultants examined each alternative independently and, with the exception of the fifth which would violate both state and federal pollution requirements, in detail. The foregoing alternatives were selected for their ability to meet pollution standards contained in current National Pollution Discharge Elimination System (NPDES) permits. After a brief description of an alternative, the consultants examined the environmental impact the alternative would have on land, water, air, social and economic considerations, construction, disposal of solid wastes, and aesthetics. The assessment also explains unavoidable adverse impacts of each alternative, its relationship to local short term uses of the environment and the maintenance and enhancement of long term productivity, and any irreversible and irretrievable commitments of resources involved.

After independent presentation of each alternative, the consulting engineers conducted a comparative analysis of alternatives, noting the environmental and cost differences of each. The assessment itself did not recommend adoption of a given alternative. The City itself made the choice of the PC process in its grant application.

The total project involved the construction of collection, interceptor, and storm sewers in Owosso and Corunna and Owosso and Caledonia Townships as well as a proposal for expansion of Owosso's treatment plant. These were the subject of a separate section of the environmental assessment and federal grant not at issue in this suit.

\* \* \* \* \* \*

*Analysis of Alternatives*

\* \* \* \* \* \*

The engineers concluded that each of the four acceptable alternatives would be equally effective in meeting NPDES requirements. Detailed cost-effective examination contained within the assessment indicates that land disposal would be the most costly alternative from the standpoint of capital expenditure (approximately 23 to 26 million dollars com-

pared to about 9 million dollars for each of the others).

Each alternative would involve site construction, each alternative except land disposal would require use of about 3.5 acres. Land disposal, depending upon the site chosen, would require between 5500 and 8,000 acres of land. However, land disposal would produce less solid waste since no chemical sludge is produced and air pollution would be reduced in the absence of need for incineration of sludge. The chief adverse social impact of land disposal arises by virtue of its reliance on large areas of now productive land and the need to displace families.

The assessment considered each feasible alternative but land disposal equally costly. These alternatives were all capable of higher removals of organic material than is now required but only PC removed nitrogen from waste water, converted ammonia nitrogen to nitrate nitrogen, and produced a dechlorinated waste water effluent.

### EPA's Appraisal and Review

After review of Owosso's grant application, supported by the environmental assessment, record of the public hearing, and other pertinent documents, EPA issued its negative declaration concluding that an EIS was not required for the Owosso project. This declaration was accompanied by the required environmental impact appraisal, a brief two-page document setting forth information on the grantee, the alternatives considered, what factors evaluation entailed, a description of the proposed project and resulting impacts, the degree of public participation, and the agencies consulted in the development of the project.

The appraisal lists as probable significant adverse environmental impacts the introduction of chemical additives into waste water, sludge incineration, and disruption attendant upon construction. Because of its brevity, the appraisal assumes significance only in the light of the detailed affidavit executed by Michael MacMullen, the EPA expert instru-

mental in the agency's review of Owosso's grant application. On behalf of EPA, he approved and recommended issuance of the negative declaration after review and appraisal indicated the absence of any significant environmental impacts.

When MacMullen made his decision, he had before him the record in this case, sans the Shanahan affidavit. This record included the grant application, local resolutions approving the application, April 1974 cost estimates, state approval and certification forms, the applicable NPDES permit, Ayres, Lewis' earlier feasibility study, the environmental assessments, and records of the public hearings.

Based on these documents, EPA found a need for advanced waste treatment technology capable of meeting effluent limitations prescribed in the NPDES permit no later than July 1, 1977 and that project cost had inflated about 60% in the one year period between grant application and award. EPA also found that the sewer project, involving some $5,695,125 of federal funds, was irrevocably dependent upon the sewage treatment facility.

EPA concluded that the feasibility of PC was demonstrated by Owosso's 1972 study, supplemented with the land treatment report issued in 1973, as well as information contained in the environmental assessment prepared for EPA review. MacMullen agreed with statements contained in the assessment indicating the costliness of land disposal and the need for relocation of residents which land disposal would entail. He found PC a process superior to the other alternatives for its ability to remove nitrogen and to operate independent of differences in ambient temperature.

In light of the record before it, EPA issued the negative declaration because the existing treatment facility would be retained and expanded upon, the chemicals, to be added for treatment were at a design level sufficient to cause pollutant removal without residual carryover of unused portions to the river, chlorination

into the discharge presented no change from present practice or that customary in cases of effluent discharge, and PC would increase water quality and nitrogen removal. EPA was also persuaded by factors mentioned elsewhere in this opinion, i. e., the lack of sufficient land for land treatment, lack of suitable soil, and the cost-effective superiority of PC over land disposal.

Given the record before the EPA, these findings were hardly arbitrary, capricious, or an abuse of discretion. Indeed, EPA's decision to issue a negative declaration appears more than reasonable and there is a reasonable basis in the record for EPA's key findings. Moreover, the record in this case reveals that EPA considered the extent to which the Owosso project would cause adverse environmental consequences in excess of those created by existing uses in the area affected by it as well as the absolute quantitative adverse environmental effects of the action itself.

The gist of EPA's decision is that the Owosso project is cost-effective and capable of abating current pollution now and in the near future with minimal disturbance of the project site to the benefit of both the community and the Shiawassee River. The only adverse consequences apparent from the record are unavoidable site disruption due to construction and some air pollution generated by sludge incineration and carbon regeneration, an effect which will be maintained within suitable air pollution limits.

The record indicates adherence to NEPA's mandate both on the part of grantee and reviewing agency alike. The environmental assessment reflects a systematic, interdisciplinary approach to insure that no significant environmental factor was overlooked. Each alternative was explored from environmental, social, and aesthetic perspectives. More than ample consideration was given to alternatives. EPA, in conformance with regulations, examined the assessment and accompanying documents, making criticisms that resulted in a revised edition of the environmental assessment.

EPA afforded the community at large an opportunity to express views on the grant application and its effects and considered both the product of the June, 1973 hearing as well as the November, 1974 hearing called specially to obtain community input as NEPA and the regulations require. The November 1974 hearing, called after the environmental assessment was prepared, demonstrated widespread approval of the grant application on the part of all quarters of the Owosso community with the exception of the plaintiff group. EPA approval of the Owosso grant was dependent upon consultation with and approval of several state agencies including the DNR, the Water Resources Commission, and the Department of Public Health.

In sum, EPA's factual findings underpinning the negative declaration are not arbitrary or capricious. The question of "non-significance" of the proposed action was correctly determined, and the procedures utilized in this case conform both to NEPA and the applicable regulations.

\* \* \* \* \* \*

In summary, neither the complaint nor the Shanahan affidavit raise substantial environmental issues or pinpoint deficiencies in the administrative record which warrant fuller factual development. Rather, plaintiff, in its disappointment over widespread approval of a project which it alone opposes, has resorted to picking apart an admittedly limited assessment and to demanding perfection in assessment and review process. NEPA, however, imposes no such requirements:

> "N.E.P.A., although rigorous in its requirements, does not require perfection, nor the impossible. In assessing the adequacy of [an environmental impact statement] practicability and reasonableness . . . are to be taken into account along with the broad purposes of the Act to preserve the values and amenities of the natural environment."

*Environmental Defense Fund v. TVA*, 492 F.2d 466, 468 n. 1 (6th Cir. 1974).

Plaintiff's claims, in effect, approach the hypercritical and thus fall beyond the ambit of this court's ability to review agency action. The court must decide whether. EPA's decision to approve the Owosso project without an EIS was arbitrary or capricious, not whether other, perhaps more accurate, or exhaustive studies should be made. *See City of Romulus v. Butterfield,* 392 F.Supp. 578, 587 (E.D.Mich.1975). "Further studies, evaluations, and analyses by experts are almost certain to reveal inadequacies or deficiencies." *Environmental Defense Fund v. Corps of Engineers,* 342 F.Supp. 1211, 1217 (E.D.Ark.1971), *aff'd,* 470 F.2d 289 (8th Cir. 1972).

Based upon a review of the administrative record and file in this case, the court concludes that defendant Train's motion to dismiss or in the alternative for summary judgment should be granted. EPA's factual findings are not arbitrary or capricious. The court's independent review of EPA's finding of "nonsignificant impact" leads to the conclusion that issuance of the negative declaration in this case was sound. Plaintiff's claims of bias and allegations of shortcomings in the environmental assessment and EPA review process do not raise substantial environmental issues or demonstrate the insufficiency of the administrative record in a manner which precludes summary judgment or necessitates supplementation of the record.

\* \* \* \* \* \*

Both defendants' motion to dismiss or in the alternative for summary judgment are granted, and judgment will be entered reflecting dismissal of the complaints with prejudice.

So ordered.