Margaret E. BOSCO, Plaintiff,

v.

Eckardt C. BECK, Region II Administrator, U. S. Environmental Protection Agency, Douglas Costle, Administrator, U. S. Environmental Protection Agency, Jerry F. English, Commissioner, N. J. Department of Environmental Protection, Pequest River Municipal Utilities Authority (Warren County), and Town of Belvidere, Defendants.

Civ. A. No. 79–1865.

United States District Court,
D. New Jersey.

Aug. 30, 1979.

**1030**

Margaret E. Bosco, plaintiff, pro se.

Louis J. Bizzarri, Asst. U. S. Atty., Trenton, N. J., for defendants Beck and Costle.

Dennis J. Krumholz, Deputy Atty. Gen. of N. J., Trenton, N. J., for defendant English.

James A. Tirrell, Jr., Phillipsburg, N. J., for defendant Pequest River Municipal Utilities Authority (Warren County).

William R. Albrecht, Schenck, Price, Smith & King, Belvidere, N. J., for defendant Town of Belvidere.

OPINION

CLARKSON S. FISHER, Chief Judge.

Plaintiff Margaret E. Bosco brings this action under the National Environmental Policy Act of 1969 [hereinafter "NEPA"], 42 U.S.C. § 4321 *et seq.*, seeking injunctive relief restraining the defendants from proceeding with plans to build sewerage collection and treatment facilities in and around Belvidere, New Jersey, until an Environmental Impact Statement [hereinafter "EIS"] has been prepared. Plaintiff contends that an EIS is required by NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C), because the construction of the sewerage facilities would be a major federal action significantly affecting the quality of the human environment.

I.  BACKGROUND

*The Parties* :  Plaintiff Margaret E. Bosco is a resident of the Town of Belvidere and the owner of property within the area to be served by the proposed sewerage projects. Plaintiff claims a direct and adverse effect upon her personal and property rights as a result of the construction of these projects. Plaintiff's standing to bring this challenge has not been questioned by the defendants.

The defendant Eckhardt C. Beck is the Regional Administrator of Region II of the Environmental Protection Agency [hereinafter "EPA"]. Douglas M. Costle is the National Administrator of EPA. Beck and Costle are collectively referred to as the federal defendants. Jerry F. English is the Commissioner of the New Jersey Department of Environmental Protection [hereinafter "DEP"]. The Warren County-Pequest River Municipal Utilities Authority [hereinafter "PRMUA"] is the agency responsible for wastewater management in the drainage basin of the Pequest River and its tributaries in Warren County, New Jersey. It is the agency designated to administer the actual planning, design, construction and operation of these projects. The PRMUA was formerly known as the Warren County-Pequest River Sewerage Authority. The final defendant, the Town of Belvidere, is the local municipality which will be served by the sewerage treatment and collection system. Each of the defendants has appeared and retained separate counsel.

*The Projects* :  The projects which plaintiff seeks to halt were developed jointly by the PRMUA, DEP and Town of Belvidere and are to be 75% funded by the federal government. New Jersey is to fund 8% of the projects and the remainder is to be borrowed. The first project is the construction of a wastewater treatment plant in White Township, to be maintained by the

PRMUA. The PRMUA applied for federal financial assistance on November 5, 1977. The application was approved and Grant No. C–34–454–02 in the amount of $2,851,-252.00 was awarded on September 29, 1978. The second project is the construction of a wastewater collection system in the Town of Belvidere which will transfer Belvidere sewerage to the PRMUA treatment facility. The application for funds to build the collection system was filed by the Town of Belvidere on September 19, 1977, and on September 29, 1978 the EPA approved Grant No. C–34–513–01 in the amount of $1,804,435.00.

*The Proceedings in this Court*: August 21, 1979 was the return date of plaintiff's application for a preliminary injunction pursuant to *Fed.R.Civ.P.* 65(a). Also returnable on that date were cross-motions for summary judgment, *Fed.R.Civ.P.* 56, filed by both the federal defendants and the DEP. In addition, with the consent of all parties, I ordered the trial of this action on the merits advanced and consolidated with the hearing on plaintiff's application for a preliminary injunction. *Fed.R.Civ.P.* 65(a)(2). This opinion therefore finally resolves this controversy and constitutes my conclusions of law and findings of fact. *Fed.R.Civ.P.* 52.

## II. THE STATUTORY FRAMEWORK

The Federal Water Pollution Control Act [hereinafter the "Clean Water Act"], 33 U.S.C. § 1251 *et seq.*, as amended, established an EPA grant program under which federal funds may be used to finance the construction of publicly owned sewerage treatment facilities. Under that grant program, EPA is authorized to make grants to any state, municipal, intermunicipal or interstate agency for the planning, design and construction of wastewater treatment facilities and wastewater collection systems. Clean Water Act §§ 201(g), 211(a), 33 U.S.C. §§ 1281(g), 1291(a). Up to 75% of the total eligible costs of an EPA approved project may be funded by the federal government. Clean Water Act § 202, 33 U.S.C. § 1282.

EPA's decision to fund the proposed construction of sewerage treatment facilities is accomplished in three distinct steps. Each step involves a separate and independent EPA determination as to whether a grant of funds should be made. 40 C.F.R. § 35.-903(a) (1978). EPA grants are made in Step 1 for use by the grantee in carrying out feasibility studies and other preliminary planning matters. At this stage primary attention is paid to the selection of the most appropriate form of treatment technology to be employed and to the selection of the best location for the treatment facility. The grantee is also charged with the duty of preliminarily examining the environmental impact of the proposed facilities. The grantee should prepare a facilities plan developed in accordance with 40 C.F.R. § 35.-917–1, which is then submitted to EPA for approval.

If the EPA approves the facilities plan, a Step 2 grant may be awarded to fund the preparation of construction drawings and specifications necessary for the construction of the approved facility. Finally, a Step 3 grant may be awarded to fund the actual construction of the facility in accordance with the design requirements developed under Steps 1 and 2. 40 C.F.R. § 35.930–1(a).

Grant funds are allocated among the states in accord with a formula specified by Congress. Clean Water Act § 205, 33 U.S.C. § 1285. The state is primarily responsible for determining the amount and timing of federal assistance to each municipality. Generally, no grant assistance may be awarded unless priority for a project has been determined by the state in accordance with a priority system developed by the state and approved by the EPA. 40 C.F.R. § 35.912. DEP is the state agency responsible for performing this function. Although the state plays an important role in determining the priority of wastewater treatment projects and in reviewing project applications, wastewater treatment projects are primarily planned and carried out at the local level.

In addition to complying with the requirements of the Clean Water Act, the

EPA must also comply with the provisions of NEPA. NEPA was passed a decade ago for the stated purpose of encouraging a "productive and enjoyable harmony between man and his environment" and promoting "efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man . . . ." 42 U.S.C. § 4321. To effect that purpose NEPA commands "all agencies of the Federal Government" to

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

The result of this requirement is that federal agencies are to examine each action which they propose to take, and, if they determine that the proposed action is a major federal action which will significantly affect the quality of the human environment, prepare an EIS with respect to the proposed action. It is with this requirement that plaintiff contends defendants have not complied.

The obligation to prepare an EIS is imposed upon all Federal Agencies. Rather than establish a single body with authority to promulgate uniform regulations enforcing this obligation, however, NEPA leaves it to each Federal Agency to formulate its own regulations implementing the Act.

The EPA has promulgated such regulations. *See* 40 C.F.R. § 6.100 *et seq.*

EPA regulations under NEPA contain both general provisions applicable to all EPA actions, *see* 40 C.F.R. §§ 6.100–6.402, and additional special provisions governing proposed wastewater treatment works construction grants made under the Clean Water Act. 40 C.F.R. §§ 6.500–6.514. Under these regulations an applicant for a wastewater treatment works construction grant is required to submit an environmental assessment to EPA as part of the facilities plan developed under a Step 1 grant. 40 C.F.R. § 6.512(a). The environmental assessment must include a description of the environmental impacts of the proposed action, a description of steps to minimize any adverse environmental effects, an evaluation of alternatives, a description of the existing and future environment without the proposed project, and supporting documentation. *Id.* The purpose of the environmental assessment is to ensure that the Step 1 grantee considers the environmental impacts of a proposed action at the earliest possible point in the Step 1 grantee's planning process, as well as to assist the EPA in deciding whether an EIS is required. 40 C.F.R. § 6.202. In order to insure public participation in the development of the facilities plan, the EPA regulations require a Step 1 grantee to hold at least one public hearing before the grantee finally adopts the proposed facilities plan as the plan to submit to the EPA for approval. 40 C.F.R. § 6.512(b).

It is the responsibility of the EPA, however, to determine whether an EIS is required by NEPA. That determination is made during an environmental review conducted either before approval of the facilities plan, or, if an approved facilities plan is not required, before Step 2 and Step 3 grants are awarded. 40 C.F.R. § 6.504(a). EPA must study the proposed action, including a review of the environmental assessment prepared by the applicant, to identify and evaluate the probable environmental consequences of both the proposed action and any feasible alternatives. 40

C.F.R. § 6.204. From this review, EPA determines whether significant impacts are anticipated from the proposed action, whether any feasible alternatives can be adopted or changes can be made in project design to eliminate significant adverse impacts, and whether an EIS or a Negative Declaration is required. *Id.*

The criteria for determining whether an EIS should be prepared are set out in the regulations. 40 C.F.R. §§ 6.200, 6.510. In part, the criteria aid in determining whether a proposed action will have significant environmental effects. 40 C.F.R. § 6.200(a). The special regulations dealing with wastewater treatment facility grants set out additional factors to be considered. 40 C.F.R. § 6.510. Additionally, the regulations mandate the preparation of an EIS when the "environmental impact" of the proposal "is likely to be highly controversial". 40 C.F.R. § 6.200(b).

If EPA determines that an EIS is not required it will issue a Negative Declaration together with an Environmental Impact Appraisal [hereinafter "EIA"]. The Negative Declaration is a written announcement prepared after EPA's environmental review stating that EPA has determined that an EIS is not required for a proposed project. 40 C.F.R. § 6.102(e). The EIA should support that decision and should briefly describe the proposed action and feasible alternatives, environmental impacts of the proposed action, unavoidable adverse impacts of the proposed action, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, steps to minimize harm to the environment, irreversible and irretrievable commitments of resources to implement the action, comments and consultations on the project, and reasons for concluding that the proposed action will not have a significant environmental impact. 40 C.F.R. § 6.212(b)(2).

The Negative Declaration and EIA are then made available to the public. The public is given fifteen working days to comment on the two documents. No administrative action on the project can be taken by EPA during the public comment period. 40 C.F.R. § 6.212. After the fifteen days have expired, EPA reviews and considers the public comments received and, if significant environmental issues have not been raised, the grant award may be made. 40 C.F.R. § 6.108(c).

In the present controversy, EPA determined, after its environmental review, that the construction of the proposed wastewater treatment facilities would not have a significant impact upon the environment. A Negative Declaration and EIA were therefore issued in lieu of an EIS. Plaintiff challenges EPA's decision not to issue an EIS, primarily on the ground that the proposals will have a significant impact on the environment. Plaintiff would have the Court overturn EPA's determination to the contrary, and require the preparation of an EIS before the proposed grant is made.

## III. THIS COURT'S TASK—THE APPROPRIATE STANDARD OF REVIEW

■ It is important to establish the exact nature of this Court's responsibility before undertaking an exhaustive examination of the administrative record below and the evidence and argument presented at the hearing. I must emphatically state that this Court is not empowered to question EPA's substantive decision to approve these projects and to grant funds for their construction. I may not substitute my own judgment as to the desirability of these projects for that of EPA. *E. g., Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 12, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

NEPA is a procedural statute. It establishes procedures which a Federal Agency must follow when it is considering a course of action. That procedure is designed to insure that the agency takes a hard and close look at the environmental consequences of its proposed action. I am to be concerned not with the actual environmental impact of these projects but only with whether EPA examined and weighed these impacts when it decided to proceed with these projects. It is plaintiff's burden,

therefore, to show that EPA did not give sufficient consideration to these impacts when it chose not to prepare an EIS.

■ There is, however, a conflict among the circuits, and even among the judges of this District, as to the appropriate standard of review which I must apply. In some circuits, EPA, or any other agency subject to NEPA, is held to the relatively high standard of "reasonableness". *E. g., Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (8th Cir. 1974) (*en banc*); *Texas Committee on Natural Resources v. Berglund,* 573 F.2d 201 (5th Cir. 1978); *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir. 1975); *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir. 1973); *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615 (D.C.Cir.1973). Under this standard plaintiff need only show that EPA's decision was unreasonable to prevail in this action. *See Concerned Citizens of Waterford Township, Inc. v. Berglund,* Civil No. 77–222 (D.N.J. May 12, 1978) (Gerry, D. J.). In other circuits EPA is held to the more lenient "arbitrary and capricious" standard. *E. g., Sierra Club v. Froehlke,* 534 F.2d 1289 (9th Cir. 1976); *Nucleus of Chicago Home Owners Association v. Lynn,* 524 F.2d 225 (7th Cir. 1975); *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *Mid-Shiawassee Cty. Concerned Citizens v. Train,* 408 F.Supp. 650 (E.D.Mich.1976), *aff'd mem.,* 559 F.2d 1220 (6th Cir. 1977). Under this standard plaintiff has the more difficult task of showing that EPA's decision was arbitrary and capricious. *See Shiffler v. Rumsfeld,* Civil No. 75–2129 (D.N.J. May 4, 1976) (Fisher, D. J.), *aff'd sub nom. Shiffler v. Schlessinger,* 548 F.2d 96 (3d Cir. 1977) (without expressing an opinion on the appropriate standard of review).

The Court of Appeals for the Third Circuit has not expressed a clear preference for either standard of review. It has raised the issue and declined to decide it numerous times. *See, e. g., Shiffler, supra,* 548 F.2d at 104 n. 5; *N.A.A.C.P. v. Medical Center,*

584 F.2d 619, 635 n. 19. I therefore will not deviate from my prior decision to apply the arbitrary and capricious standard to review challenged agency actions under NEPA. *See also Kleppe, supra,* 427 U.S. at 412, 96 S.Ct. 2718; *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Duquesne Light Co. v. EPA,* 522 F.2d 1186, 1192–93 (3d Cir. 1975). I must therefore review the administrative record upon which EPA based its decision in order to insure that there was a sound basis for the decision and that it was not arbitrary or capricious.

## IV. THE RECORD BELOW

State and local authorities in the Warren County-Pequest River locale first began considering the advisability of replacing Belvidere's system of individual septic tank sewerage treatment with centralized sewerage collection and treatment facilities in the 1960's. *See* Town of Belvidere Master Plan (McCrosky and Reuter, July 1964); Feasibility Report on Regional Sewerage Facilities, Warren County, New Jersey (Elam and Popoff 1968); Administrative Record, Item [hereinafter "A.R. #"] 87 at 3. The PRMUA, with the aid of a Step 1 grant from EPA, commissioned the engineering firm of Elam & Popoff, P.A., to prepare a facilities plan which would examine the alternatives and propose the most appropriate wastewater treatment facilities for use in Belvidere's future. Their report, entitled "Wastewater Facilities Plan for the Pequest River Drainage Basin, Warren Co." [hereinafter "Plan"], was issued in September of 1977. *See* A.R. # 92. This report was submitted to EPA for approval in conjunction with the applications of the PRMUA and the Town of Belvidere for grant funds to construct the sewerage facilities at issue here.

The Plan proposed by the applicants was the result of long and careful study. Prior to the issuance of the final plan, a draft of the Plan was issued in May of 1976. A.R. # 88. In compliance with EPA regulations, 40 C.F.R. § 6.512(b), a public hearing was held after the draft plan was proposed

and before the final Plan was adopted and submitted to EPA for approval. *See* A.R. # 92, Appendix E. (Transcript of Public Hearing, May 27, 1976). In that same month, defendants' engineers also issued a document entitled "Environmental Assessment for the Proposed Sanitary Sewer Collection System (Belvidere)". A.R. # 87. Although not required by EPA regulations, a public hearing was also held with respect to the Environmental Assessment. *See* A.R. # 88, Appendix A. (Transcript of Public Hearing, August 9, 1976). Additional Project and Engineer's Reports were prepared to conform with New Jersey DEP regulations in 1973 and 1974. Those reports were all revised and updated in November of 1976. *See* A.R. # # 89, 90, 91.

All of these documents were submitted to EPA as part of the grant application. I have not set out their contents in detail because EPA may not rely solely upon them in determining whether a proposal will have significant environmental effects. Rather, EPA is charged with the duty of conducting an independent examination of the project in order to determine the significance of the project's environmental consequences.

After the grant application was certified to EPA by DEP, EPA commenced its environmental review to determine if an EIS was required. 40 C.F.R. §§ 6.104(c), 6.204. The purpose of that review is to "determine whether significant impacts are anticipated from the proposed action, whether any feasible alternatives can be adopted or changes can be made in project design to eliminate significant adverse impacts, and whether an EIS or a Negative Declaration is required". 40 C.F.R. § 6.204.

Based upon its environmental review of these projects EPA determined that an EIS was not required. A Negative Declaration was issued with respect to each project. *See* A.R. # # 32, 33. A single EIA covering both projects was issued setting forth EPA's analysis and findings. *Id.* It is that EIA which is the center of much of this controversy. It is an eleven-page document, with attachments, which concludes that the construction would have only a minimal impact by inducement of increased housing primarily around the edge of the already developed area; that the unavoidable adverse environmental impacts are primary impacts due to actual construction, the effects of which are short-termed and able to be minimized by construction specifications and control constraints; that land application and wastewater reuse were not acceptable alternatives; and that the construction projects involving surface water discharge will have a long-term beneficial effect on the economy by achieving water quality standards, improving water quality so as to increase the aesthetic and recreational value of the area, and expanding the area's sewer service while eliminating the problems caused by existing septic systems. *See* 40 C.F.R. § 6.212(b)(2).

In accordance with 40 C.F.R. § 6.212(a), the Negative Declaration was not, at the time of its issuance, EPA's final decision. Copies of the Negative Declaration were distributed among the public and comments were solicited. A fifteen-day comment period was provided. 40 C.F.R. § 6.212(a). Only one comment was received during that period. *See* A.R. # 34. After the comment period expired, the decision not to prepare an EIS was finalized, and a determination was made to grant the applications and fund the projects.

The two construction grants were finally awarded on September 29, 1978. Only after that time was EPA barraged with numerous comments belatedly objecting to the project. *See* A.R. # # 38, 41, 44, 48, 70, 71, 72, 75, 76, 77, 78, 80, 81, 82, 83, 86. Although not called for by the regulations, EPA responded to all of these comments. A public meeting was also held to respond to the objections. *See* A.R. # # 57, 58, 59, 71 and 94 (Transcript of EPA Public Meeting, February 15, 1979). The meeting was not merely between EPA officials and local citizens, but also in attendance were numerous representatives of the state and local agencies involved in the planning of the projects. That meeting was chaired by Mr. Kenneth Stoller, P. E., the Chief of the New Jersey Water Programs Branch of the

DEP. Plaintiff was also in attendance and made known her objections at that time. A subsequent letter, dated March 20, 1979, was sent out to those in attendance. In nineteen pages that letter sought to address the issues raised at the meeting. See A.R. # 71. The applicants thereafter decided to proceed with the project as planned and EPA reaffirmed both its decision not to prepare an EIS and its decision to grant funds to build the facilities.

## V. PLAINTIFF'S OBJECTIONS TO EPA's DECISION

EPA regulations set forth a long and detailed list of the general criteria to be considered when a decision as to the need for an EIS is to be made. See 40 C.F.R. §§ 6.200(a), 6.510. The regulations also set out in some detail the procedure by which that determination is to be made, including the amount of public participation required. See 40 C.F.R. §§ 6.512(b), 6.212(a). Rather than wade through these regulations one by one to determine whether EPA has complied with them all, I will focus upon the specific objections raised by plaintiff's complaint. Although it is difficult to extract with precision what plaintiff's objections are, I believe that they can accurately be lumped together in four categories. They are:

(1) EPA's conclusion that these projects are not major federal actions significantly affecting the quality of the human environment is incorrect;

(2) These projects are controversial and require the preparation of an EIS;

(3) The decision making process was tainted by EPA's failure to consider potential alternatives to these projects; and

(4) The decision making process was tainted by the lack of public participation.

A. *Major Federal Actions Significantly Affecting the Quality of the Human Environment.*

■ This Circuit has adopted a dual standard in interpreting the requirements of this phrase. *N.A.A.C.P. v. Medical Center, Inc., supra* 584 F.2d at 625–27. An EIS is therefore required if an action is both a major federal action and if it will have significant environmental consequences. The two terms do not have identical meanings.

Plaintiff points to the cost to the federal government of these projects, upward of $4,000,000.00, to bolster her claim that these projects constitute major federal actions. *See Concerned Citizens of Buck Hill Falls v. Grant,* 388 F.Supp. 394, 398 (M.D.Pa.1975), *vacated and remanded in part on other grounds,* 537 F.2d 29 (3d Cir. 1976). None of the defendants have challenged this contention. I agree with plaintiff and must conclude that these projects do constitute major federal actions.

Plaintiff also contends that EPA's conclusion that the projects will not significantly affect the environment is not supported by the record. The complaint makes specific reference to at least five impacts which plaintiff alleges are significant: (1) reduction in general level of groundwater recharge; (2) air pollution from the operation of the treatment plant; (3) damage to private property caused by alignments of the collection system; (4) damage to trout maintenance streams caused by alignment of the collection system; and (5) damage to aquatic biota at site of the treatment plant outfall into the Delaware River.

A review of the administrative record reveals that none of these impacts escaped the attention of EPA. In each case EPA noted the probable existence of the impact, and then determined that the anticipated impact was insignificant.

The EIA, A.R. # # 32, 33, at page 6, recognized that there would be a reduction in the general groundwater recharge level. In a letter distributed subsequent to the public meeting of February 15, 1979, EPA stated specifically that:

Based upon calculations using the basin area of the Pequest River at Belvidere the amount of recharge lost due to the projects would be .006 million gallons per

day per square mile (mgd/sq.ml.). The total recharge to the basin area would be 1.3 mgd/sq.ml. This value was determined by calculating the total amount of recharge available from precipitation and runoff. As can be seen the amount lost due to the projects is a negligible amount. (A.R. # 71, p. 17.)

It was certainly not unreasonable for EPA to conclude that a groundwater loss of less than five-tenths of one percent would not be a significant impact upon the environment.

Plaintiff's complaint comes closer to the mark when she points to the contradictory statements contained in the EIA with regard to odors produced by the treatment plant and their impact on Belvidere's residents. At page 3 the EIA admits that odors will be produced at the treatment facility, but concludes that "[s]ince there are no communities near the plant site, the adverse effects of odors on residents in [sic] non-existent". At page 4, however, the EIA states that the "[n]oise produced by the sewage treatment plant will affect residential areas to some extent because of the location of homes in the immediate area". And, finally, at page 5, the EIA again refers to odors, this time concluding that "[a]s there are houses adjacent to the treatment plant site [odors] may be a problem in the absence of screening vegetation to reduce wind velocity at the plant site".

Needless to say, this is an indication of sloppy draftsmanship. However, it points out that the problem of odors was given serious consideration and procedures were chosen to mitigate any impact. "[C]areful operation and maintenance practices and the use of chlorine" will minimize odors actually produced. EIA, *supra*, at 3. A vegetation screen will be constructed to reduce the impact upon the town of odors not eliminated. EPA concluded that the use of these devices would reduce the level of this impact to insignificance.

The EIA also notes that the proposed alignments of the collection system will have an impact on the environment. The primary impacts, however, will occur during construction and will be largely eliminated when construction is completed. Numerous techniques have been adopted to minimize this impact. The construction easements will be wider than the permanent easements. Vegetation will not be removed outside of the construction easement and the sites will have to be returned to their original condition afterward. Tree tunnelling will be utilized to prevent the destruction of mature trees with diameters of twelve inches or more. *See* A.R. # 87 at 35–45.

Even after construction additional steps have been taken to minimize the permanent environmental consequences of the alignments. The manhole covers of alignments in the flood plain will be watertight. The alignments have been placed in positions where gravity, rather than pumping stations, can be used to maintain the flow of the sewerage. The net effect of these and other design features of the Facilities Plan rendered these impacts, in EPA's eyes at least, insignificant.[1]

Plaintiff's allegations with regard to alignments crossing a certain trout maintenance stream are also without merit. She merely argues that the streams will be crossed. No mention is made of how the crossing will 'affect the environment, or why such impacts are significant. In fact, the state defendants are quick to point out that no evidence has been presented that the stream is in fact a trout maintenance stream.

Finally, plaintiff's reference to the increased river turbulence at the outfall from the treatment plant is to no avail. The EIA notes the increase in turbulence. The Plan lists the figures upon which EPA's determination of insignificance is based. The Dela-

---

1. Plaintiff also complained about the fact that 7% of the easements will traverse private property, thereby preventing the construction of swimming pools or buildings with foundations in these areas. Although certainly significant to the individual landowners, I do not believe it unreasonable to conclude that these effects are not significant as that term is employed in NEPA.

ware River at Belvidere has an average flow of 7,817 cubic feet per second. The outfall for the treatment plant will add to that amount an additional .77 cubic feet per second. A.R. # 92 at IX–37. Once again there is a sound basis in the record for EPA's conclusion that this is not a significant impact.

I have not mentioned other averments of plaintiff, made either in her verified complaint, in her brief, or at oral argument, because they have less merit than the five discussed above. In each case an impact has been noted by EPA and EPA has concluded that the impact is not significant.[2] Their conclusions are based upon a solid foundation of study and investigation. On the basis of the record before me, and the oral argument of all parties at the hearing, and the testimony of witnesses on behalf of plaintiff's case, I am satisfied that the defendants' acts were neither arbitrary nor capricious, nor an abuse of discretion.[3] The decision therefore must be upheld.

### B. Matters of Public Controversy.

█ In addition to requiring an EIA for every major federal action significantly affecting the quality of the human environment, EPA also requires the preparation of an EIS "when the environmental impact of a proposed EPA action is likely to be highly controversial". 40 C.F.R. § 6.200(b). Plaintiff invokes this rule because of the controversial nature of the project and the great public outcry against it.

Plaintiff, however, misreads the nature of the rule. The rule comes into play only if the environmental impact of a project, and not the decision to build it, is a subject of controversy. *E.g., Rucker v. Willis,* 484 F.2d 158, 162 (4th Cir. 1973). In this case, all parties seem to agree about the probable nature of the environmental impacts of the project. The dispute is over whether the impacts are significant. An EIS is therefore not required by 40 C.F.R. § 6.200(b).

### C. Consideration of Alternatives.

█ Plaintiff's allegations that the decision was tainted because EPA failed to consider the alternatives is entirely without merit. The briefest examination of the record reveals that it is totally unsupported by the record. *See* A.R. # # 87 at 10–12; 29 at Part VII; 32, 33 at 8–9; 71 at 2–5. More specifically, plaintiff contends that defendants failed to consider what she refers to as the "lagoon" method. Although I cannot pinpoint in the record at what stage EPA first considered the lagoon alternative, by the time the EPA reaffirmed its decision to make the grant it had clearly addressed plaintiff's preferred alternative. *See* A.R. # 71 at 12. I must therefore reject plaintiff's arguments that EPA failed to consider appropriate alternative treatment technologies.

### D. Public Participation in the Decision Making Process.

█ Plaintiff has repeatedly asserted that the lack of public participation in the decision making process renders the EPA decision void. She has not, however, set out with any specificity how it was that the public was excluded from the decision making process. A review of the administrative record, *see infra* at 1034–1036, shows that the public was given the opportunity to

---

2. At oral argument plaintiff referred numerous times to alleged conflicts of interest on the part of an individual who was both mayor of Belvidere, the chairperson of the PRMUA, and a former staff member of former Congresswoman Helen Meyner. Although, if proven, there might be some basis for complaint under state law because of the activities of this state official, *see, e. g.,* N.J.S.A. 40:69A–163, these allegations have no bearing upon the question which I am called upon to decide, whether EPA properly concluded that an EIS was not required.

3. Notwithstanding the fact that I believe the arbitrary and capricious standard to be the appropriate standard of review of EPA–NEPA decisions, *see supra* at 10–11, I recognize that fairly strong legal arguments can be made for the application of the reasonableness standard. I would therefore like to note that, on the basis of the record before me, I would conclude that EPA based on the record before it, reasonably concluded that the impacts of these projects were not significant.

participate and in fact took advantage of that opportunity.

The draft facilities plan was released in May of 1976. A.R. # 87. In accord with 40 C.F.R. § 6.512(b), the responsible officials scheduled a public hearing to consider the draft. The hearing was conducted on May 27, 1976. See A.R. # 92, App. E. (Transcript of Public Meeting, May 27, 1979). Public Notice of the hearing was given by publication in the "Star-Gazette" on April 22, 1976, and in the "Belvidere News" on April 21, 1976. In each case the notice specified the topics to be discussed and indicated when and where copies of the draft plan could be found. See Ex. F–1, F–2 of Appendix Filed In Support of State Defendant's Motion For Summary Judgment. Additional steps were taken by the defendants to insure adequate public notice, including the sending of letters to the town clerks of all of the involved communities, and to community groups indicating an interest in the matter. See A.R. # 92, App. E at 43–47.

A separate town meeting was held with respect to the Environmental Assessment. A.R. # 87. That meeting was held on August 9, 1976. See A.R. # 87, App. A (Transcript of Public Hearing of August 9, 1976).

On September 8, 1978, EPA issued the Negative Declarations and EIA's on these projects. Copies were mailed to some forty individuals. See A.R. # # 32, 33. A fifteen-day comment period was established pursuant to 40 C.F.R. § 6.212(b). Although not required by law, EPA scheduled a public meeting for February 15, 1979. See A.R. # 94 (Transcript of Public Meeting, February 15, 1979). That meeting and the outcome of that meeting have been discussed previously, see supra, pages 1035–1036, and I will not repeat that discussion here. See A.R. # # 57, 58, 59, 71, 94.

On the basis of this review of the record I do not detect any grievous flaws in the proceedings conducted by the EPA. The public did participate quite vigorously in the decision making process. Aside from her general allegations, plaintiff has pointed to no specific defects to which I may direct my attention. I must therefore conclude that EPA complied with the obligations imposed upon it by its own regulations.

## VI. CONCLUSION

Since the trial on the merits of this action was advanced and consolidated with the hearing on the application for a preliminary injunction, Fed.R.Civ.P. 65(a)(2), I must determine whether plaintiff has demonstrated her entitlement to the entry of a permanent injunction. Rather than look to whether plaintiff has demonstrated a reasonable probability that she will succeed on the merits, see Doe v. Colautti, 592 F.2d 705 (3d Cir. 1979), I must determine whether in fact and law plaintiff has succeeded on the merits of this action. As can be seen from my review of the arguments of plaintiff and the evidence adduced in her behalf, I am satisfied that plaintiff has been unable to sustain her burden of showing that EPA's decision not to prepare an EIS for these projects was arbitrary or capricious. See also Mid-Shiawassee County Concerned Citizens v. Train, 408 F.Supp. 650 (E.D.Mich. 1976), aff'd mem. 559 F.2d 1220 (6th Cir. 1977); Pokorny v. Costle, 464 F.Supp. 1273 (D.Neb.1979); Concerned Citizens of Waterford Township, Inc. v. Berglund, Civil No. 77–2220 (D.N.J. May 13, 1978).

Plaintiff's application for injunctive relief is therefore denied, her complaint dismissed, and judgment will be entered in favor of all defendants. I therefore need not address the numerous other issues raised at the hearing, and all other motions are denied. Judgment shall be entered in accord with this opinion.