HOVSONS, INC., a New Jersey corporation; the Coalition to Save Agriculture, a New Jersey Corporation; the Coalition for the Sensible Preservation of the Pinelands, an unincorporated association; Folsom Township, a municipal corporation of the State of New Jersey; Woodland Township, a municipal corporation of the State of New Jersey, Plaintiffs,

and

Marvin F. Matlack and Shirley Ann Matlack, Pineland landowners, individually and on behalf of their minor children, Pamela and Desiree; Pineland Landowners Defense Fund, Inc., a New Jersey Corporation; Board of Education of Washington Township, a corporate entity under the laws of the State of New Jersey; and Board of Education of Woodland Township, a corporate entity under the laws of the State of New Jersey; Township of Lacey, a municipal corporation of the State of New Jersey; and Lake Lenape Land Co., a corporation of the State of New Jersey, Plaintiffs-Intervenors,

v.

The SECRETARY OF the INTERIOR OF the UNITED STATES of America, Defendant,

and

State of New Jersey; the Pine Barrens Coalition; the New Jersey Audubon Society; the Environmental Defense Fund, Inc.; the Natural Resources Defense Council, Inc.; Friends of the Earth; the Sierra Club; the National Parks and Conservation Association; the American Rivers Conservation Council; and the National Wildlife Federation, Defendants-Intervenors.

Civ. No. 81–97.

United States District Court,
D. New Jersey.

July 14, 1981.

Robert V. Paschon, Paschon, Feurey & Murray, Toms River, N.J., for plaintiffs Hovsons and The Coalition to Save Agriculture.

Raymond Brown, Brown, Brown & Furst, Newark, N.J., for plaintiffs The Coalition for the Sensible Preservation of the Pinelands, Folsom Township and Woodland Township.

Joseph W. Marshall, Mid-Atlantic Legal Foundation, Philadelphia, Pa., for plaintiffs-intervenors Marvin, Shirley, Pamela and Desiree Matlack, Pineland Landowners Defense Fund, Board of Education of Washington Township, and Board of Education of Woodland Township.

George R. Gilmore, Hiering, Gilmore & Monahan, Toms River, N.J., for plaintiffs-intervenors Township of Lacey and Lake Lenape Land Co.

William W. Robertson, U.S. Atty., by Jerome B. Simandle, Asst. U.S. Atty., Trenton, N.J., for defendant Secretary of the Interior.

James R. Zazzali, Atty. Gen. by Richard M. Hluchan, Deputy Atty. Gen., Trenton, N.J., for defendant-intervenor State of New Jersey.

Matthew P. Boylan, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N.J., for defendants-intervenors The Pine Barrens Coalition and The New Jersey Audubon Society.

Lawrence D. Ross, Madison, N.J., for The Environmental Defense Fund, The Natural Resources Defense Council, Friends of the Earth, The Sierra Club, The National Parks & Conservation Assoc., The American Rivers Conservation Council and The National Wildlife Federation.

James T. B. Tripp, Environmental Defense Fund, Inc., New York City, for defendant-intervenor The Environmental Defense Fund.

## OPINION

ANNE E. THOMPSON, District Judge.

This case presents a challenge by a number of plaintiffs to an action taken by the Secretary of the Interior on January 16, 1981, in which he indicated his approval, pursuant to 16 U.S.C. § 471i(g)(1), of the Comprehensive Management Plan ["CMP"], for the conservation and development of that area of the State of New Jersey known as the Pinelands. In response to 16 U.S.C. § 471c and d, the State had drawn up this procedural and substantive plan. Following the creation of the CMP by the Pinelands Commission, which had itself been called into existence by Governor Byrne's Executive Order No. 71 of February 8, 1979, and extended by the Pinelands Protection Act, N.J.S.A. 13:18A–1 *et seq.* the CMP was submitted to the Secretary of the Interior.

The task of the Secretary was to review the CMP in terms of the criteria set forth at 16 U.S.C. § 471i(g)(2). On approval by the Secretary, New Jersey would be eligible to receive federal funds to aid in the implementation of the CMP. The Secretary's review of the CMP was not related to the plan's existence or authority, since it had already been promulgated by the State authorities, but only to the CMP's assistance by means of federal funding.

While the State was drawing up the CMP, the federal officials were formulating an environmental impact statement ["EIS"], the document which is required by

the National Environmental Protection Act ["NEPA"], 42 U.S.C. § 4321 *et seq.*, to be a part of the decision-making process in every federal action which promises to have a significant effect upon the environment. The Final Environmental Impact Statement ["FEIS"] was issued on December 10, 1980.

Plaintiffs began this suit by applying for a temporary restraining order on January 12, 1981, to enjoin the Secretary from approval of the CMP. The complaint alleged that the Secretary's approval of the CMP, which was imminent, would be a violation of NEPA due to a deficient EIS, and a violation of the Fifth Amendment and the National Parks and Recreation Act ["NPRA"], the federal law which invited New Jersey to draw up the CMP. We denied the application for a temporary restraining order on January 12, and set a return date of February 2, 1981 for an order to show cause why a preliminary injunction should not issue.

There followed a series of motions for intervention, filed by a variety of parties on both sides of the issues in this case. These motions were granted, and the litigants presently before the Court as intervenors were granted leave to file appearances.

On January 26, 1981, the defendant Secretary of the Interior filed a motion to dismiss the complaint. The order to show cause, as well as the motion to dismiss, were ordered adjourned without date from February 2. At a hearing on these matters on February 19, plaintiffs' application for a preliminary injunction was denied as moot, in light of the Secretary's approval of the CMP. However, plaintiffs were given leave to amend their complaint. Also on February 19, we adjourned the Secretary's motion to dismiss to March 16.

On March 4, 1981, the defendant-intervenors Pine Barrens Coalition, New Jersey Audobon Society, Environmental Defense Fund, Inc., Natural Resources Defense Council, Inc., Friends of the Earth, Sierra Club, National Parks and Conservation Association, American Rivers Conservation Council and National Wildlife Federation filed a motion for summary judgment. The remaining defendant-intervenor, the State of New Jersey, filed its pending motion for dismissal, abstention or summary judgment on March 18. In addition, the plaintiff-intervenor Pineland Landowners Defense Fund, Inc., filed a motion for a preliminary injunction on March 17, 1981.

The final filing of a pending motion in this case occurred on March 31. The defendant Secretary of the Interior filed his motion for summary judgment on Counts I and II of the complaint, the second amended version of which was filed one day later, on April 1, 1981. On April 7, we heard argument on all defendants' motions except the Secretary's summary judgment motion on the first two counts, and reserved our decision. On April 23, we denied plaintiff-intervenor's motion for a preliminary injunction, and on May 5, 1981, we heard argument addressed to the defendant Secretary's summary judgment motion. At that time we reserved judgment.

The time has now come to resolve these pending motions. Because we address ourselves to and decide the Secretary's motion on Counts I and II and the State of New Jersey's motion on Count III of the Second Amended Complaint in such a way as to moot all other pending matters, we will not discuss them. Nevertheless, we wish to take this opportunity to state that the able job done by all counsel in briefing and arguing all the pending motions has assisted the Court in framing and determining the issues presented by this case.

*Propriety of Summary Judgment*

*Fed.R.Civ.P.* 56 provides that no summary judgment may be granted unless the moving party demonstrates that there is no genuine issue as to any material fact. The moving party must show that he is entitled to judgment as a matter of law. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3rd Cir. 1980). There are, in essence, three major issues framed by plaintiffs' complaint. First, whether the defendant Secretary of the Interior improperly approved New Jersey's CMP because his approval was based upon a defective EIS. This question, of course, requires a predicate finding

that the EIS was, in fact, defective. Second, whether the defendant Secretary of the Interior improperly approved the New Jersey's CMP because he failed to make the findings required for approval under 16 U.S.C. § 471i(g)(2). Third, whether New Jersey's CMP, as approved by the Secretary of the Interior, amounts to a violation of the plaintiffs' Fifth and Fourteenth Amendment rights to be free from a governmental "taking" without just compensation.

■ In pressing their motions for summary judgment, defendants rely on the FEIS and New Jersey's CMP, as well as the affidavits of Robert McIntosh and Bernard Fagan, and the Secretarial Issue Document drawn up by the Interior Secretary. In opposing defendants' motions, the plaintiffs are not entitled to rest on their pleadings. Although all inferences to be drawn from any evidentiary material submitted will be drawn in favor of the party in opposition, *Special Jet Services, Inc. v. Federal Insurance Company*, 643 F.2d 977 (3rd Cir. 1981), that party also has the responsibility to come forward with his own material to demonstrate the existence of a conflict. *DeLong Corporation v. Raymond International, Inc.*, 622 F.2d 1135, 1142 (3rd Cir. 1980).

All three of the issues stated in plaintiffs' complaint may properly be considered in the context of these motions for summary judgment. A careful analysis of precisely what plaintiffs' complaint must be understood as asserting reveals that there are no genuine issues of fact to bar summary judgment at this time. Here, as elsewhere, it is important to focus on the fact that the complaint is directed against the Secretary's approval of the CMP, not against the CMP itself. Whatever the faults of the CMP, it exists as a finished product upon which the FEIS was based. Plaintiffs' complaint calls upon the Court to make a series of legal determinations and defendants' summary judgment motions simply point out that these determinations may be

made now. Plaintiffs have not introduced any materials which lead us to believe that any further fact gathering is necessary to elucidate, explain or alter the record which has been developed for the pending motions. For instance, plaintiffs argue that summary judgment on Count II is not appropriate because "factual issues" are raised by their proffered affidavits alleging that certain members of the public were deprived of what was, in their opinion, an adequate opportunity for public participation in the CMP. However, the adequacy of public participation is not at issue in Count II. What is at issue is the Secretary's approval of the CMP, including his consideration of whether

> the planning entity has afforded adequate opportunity, including public hearings, for public and governmental involvement in the preparation and review of the plan, and whether such review and comment thereon were considered in the plan or revision as presented to him;

16 U.S.C. § 471i(g)(2)(A).

Clearly, the facts of public participation underlie, but do not determine the legal adequacy of the Secretary's consideration of that public participation in his review of the CMP. In other words, both of the first two counts of the complaint[1] require that we function as reviewers of the *procedure* of Secretarial review, and not of the *substance* of that approval. So long as the Secretary did what he was supposed to do under the law, the content of what he approved is not at issue in this lawsuit. As the Court in *Greater Saint Louis Health Systems Agency v. Teasdale*, 506 F.Supp. 23, 32 (E.D.Mo. 1980) said in similar circumstances, "[t]his Court cannot enact a satisfactory law for the State."

> [New Jersey's CMP] obviously has to satisfy the Secretary. *However, the fact that the Secretary must be satisfied does not mean that the plaintiffs must be satisfied...*

*Id.*, at 36 (emphasis added).

With this in mind, it is clear that the record now before the Court contains all

---

1. Because we deal with Count III in the context of a motion for abstention and not summary judgment, we speak here only of Counts I and II.

that is necessary to perform our review: the CMP, the EIS, the Secretarial Issue Document, these being the raw material of Secretarial review; and the presentation in the affidavits of the setting, procedure and timetable of the Secretary's actions. This record amply reflects for our review the procedure which the Secretary followed in his review of the CMP.

*Parties*

Plaintiff, Hovsons, Inc., describes itself as a builder and developer and the owner of 562.87 acres in Berkeley Township, Ocean County. Hovsons complains that it is unable to complete a subdivision which it had planned and begun on the land as a result of "the Moratorium issued by Governor Brendan T. Byrne under Executive Order 71 and ... the Pinelands Protection Act, N.J.S.A. 13:18A–1 *et seq.*" (Second Amended Complaint, ¶ 2).

Plaintiff Coalition for the Sensible Preservation of the Pinelands is an unincorporated association of individuals and groups; the complaint alleges that the individual members of the group live in the vicinity of the Pinelands National Reserve as set out in the National Parks and Recreation Act of 1978, 16 U.S.C. § 471i *et seq.*, and in the Preservation Area established by the Pinelands Comprehensive Management Plan. This plaintiff also alleges that it proposed to the Pinelands Commission ["PC"] an alternative to the CMP, which alternative, it is presumed, was rejected. (¶ 1).

Plaintiff Coalition to Save Agriculture is made up of persons who live in and/or use the Pinelands; they allege a "deep appreciation of the Pinelands and a desire to preserve them for future generations." They complain that some of their members are severely affected by the building restrictions contained in the CMP; and also that they are the owners of land which "may be" acquired by the United States or the State of New Jersey.

Plaintiff Folsom and Woodland Townships are wholly or partially included in the Pinelands. They complain that the CMP and the PC will usurp and override their municipal responsibilities for such things as "land use, planning, zoning, municipal services, and quality of life in their respective communities." (¶ 4).

Plaintiff Township of Lacey, 70 of whose 85 square miles are included in the CMP, complains that "[w]ith the adoption of the Pinelands CMP, the Township finds itself in a position of virtually a no-growth future." More specifically, Lacey complains that because of the CMP it will suffer a reduction in ratables and a decline in its school population. Additionally, Lacey complains that it had no participation in the formulation of the CMP. (¶ 5).

Plaintiff Lake Lenape Land Company alleges that it is the owner of some 1758 acres in Hamilton Township, Atlantic County, which is subject to the provisions of the CMP. Lake Lenape Land complains that "[d]evelopment of said property on an economically feasible scale has been rendered impossible by the Pinelands CMP ... and has rendered the land virtually useless." (¶ 6).

Plaintiffs Marvin F. and Shirley Ann Matlack are residents of Burlington County, and own land in Chatsworth, New Jersey which is subject to the provisions of the CMP. They also allege that they have one child attending public school "within the Pinelands National Reserve." It is not alleged in the complaint that they have suffered any injury as a direct result of the Secretary's action. (¶ 7, 8, 9). Testimony in the record given by plaintiff Marvin Matlack attempts to imply that his property has lost its value.

Plaintiff Pinelands Landowners Defense Fund, Inc. is a non-profit corporation with approximately 250 members. These persons, it is alleged, reside and/or own land and/or pay various taxes and/or recreate in the area of the Pinelands National Reserve. This organization complains that it has among its membership persons who do not qualify for the so-called "Piney Exemption" which is part of the CMP. In addition, some members of the organization have relatives who would like to live in the area but who likewise do not qualify for the "Piney Exemption." (¶ 10, 11, 12, 13).

Plaintiff Board of Education of Washington Township administers the school system of that township, which is located within the Pinelands National Reserve. This plaintiff alleges that it is responsible for raising some 60% of the annual budget for the school system. It is presumed that the plaintiff's complaint is that, like Lacey, it will suffer a loss in tax ratables as the result of the CMP and thus be unable to raise the money required for the school budget. (¶ 14, 15, 16).

Plaintiff Board of Education of Woodland Township administers the school system of that township, which is located within the Pinelands National Reserve. Like the Board of Education of Washington Township, this plaintiff alleges that it must raise 60% of the annual school budget. As with Washington, we presume that Woodland's Board of Education is complaining that it will not be able to raise this money as the result of a loss of tax ratables flowing from the CMP's adoption and operation. (¶ 17, 18, 19).

Under Section IV of the Second Amended Complaint, labeled "Standing," plaintiffs have alleged the interests and facts which they feel entitle them to prosecute this action. In a general statement, paragraph 36 alleges that plaintiffs' standing proceeds from their "interest in the preservation and environmentally sound development of the Pinelands, their residence in and use and enjoyment of the Pinelands," their governmental jurisdiction, and their ownership of property which may be acquired under the Pinelands legislation.

Section IV of the complaint then proceeds to list each plaintiff individually, alleging standing for each "by virtue of the economic, environmental and social injuries sustained by them as a result of the Pinelands CMP, submitted by the State of New Jersey and approved by the defendant, Secretary of the Interior." (¶ 37–48).

The defendants have raised the issue of plaintiffs' standing in their motions. This question is complicated in the present case because the plaintiffs complain exclusively of the effects upon them of the State's CMP. The harms alleged in their complaint are, without exception, a litany of wrongs suffered as the result of the imposition of the CMP. The act of the Secretary of the Interior in approving the plan did not in any direct way affect any plaintiff. The effect of the defendant's action upon the plaintiffs was at most indirect, opening the possibility, but not the certainty, of federal funding of the CMP. Therefore, plaintiffs have brought before the Court a defendant whose actions have only the potential and derivative effect upon the plaintiffs of making the CMP more likely to be implemented.

The defendants have argued that this problem in plaintiffs' position demonstrates their lack of standing, because of the "redressability requirement" of Article III jurisprudence. The requirement was pointed out in *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–1608, 60 L.Ed.2d 66 (1979), where the Court spoke of "the Article III minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself' ... that is likely to be redressed if the requested relief is granted." *See also, Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 261–62, 97 S.Ct. 555, 561–562, 50 L.Ed.2d 450 (1977).

Plaintiffs in this action seek the following relief: 1. an order voiding the approval of the CMP by the Secretary of the Interior; 2. an order requiring the Secretary to prepare a new environmental impact statement; 3. an order requiring the Secretary to reconsider the CMP in light of this new EIS; 4. a stay in the 90-day statutory period for review of the CMP until the new EIS is prepared; 5. a permanent injunction against the approval of the CMP which the Secretary issued on January 16, 1981.

■ While plaintiffs' status under the redressability portion of our standing inquiry does not admit of any simple answer, we believe that, as a practical matter, a grant to plaintiffs of the relief which they seek would provide significant promise of redress of the harms which they allege. This case is complicated by the fact that the

legislation challenged is a joint federal-state effort. While this intermingling of actors and effects does complicate matters, it also serves to clarify plaintiffs' standing. While it is the State of New Jersey which drew up and will be enforcing the CMP, it is the federal government which invited the State to draw up the plan. More to the point, if the CMP is funded, and has the effects which plaintiffs allege, it will be in large part funded by federal money. It is the action of the Secretary of the Interior which paved the way for federal funding. A decision in plaintiffs' favor would reverse that action and interpose a sizable road-block to any further implementation of the federal role in the CMP. That is why we are satisfied that the test that "there is a 'substantial likelihood' that the relief requested will redress the injury claimed" is essentially met. *Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 75 n.20, 98 S.Ct. 2620, 2631 n.20, 57 L.Ed.2d 595.

### Count I

Count I of the plaintiffs' complaint alleges that the defendant is guilty of a violation of the National Environmental Protection Act, NEPA. Specifically, the complaint alleges that the EIS upon which the Secretary relied in making his decision to approve New Jersey's CMP was legally deficient in a number of respects. NEPA requires that a federal agency contemplating "any major Federal action funded under a program of grants to States," 42 U.S.C. § 4332(2)(D),

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

Following a consideration of the appropriate standard under which we must review the sufficiency of an EIS, we shall proceed to an analysis of each of the paragraphs in the first count, and determine their legal sufficiency in light of the pending summary judgment motion.

### A. *Standard of Review*

In a general review such as the one necessitated by the case at bar, there are actually two separate analyses which we are being asked to perform. First, we must review the legality of the Secretary of the Interior's decision to approve the CMP. This is, in essence, Count II of the complaint. Second, we must review the legality—that is to say, the legal sufficiency—of the EIS which was prepared and upon which the Secretary relied in approving CMP. This is, in essence, Count I of the complaint. It is important to recognize the separateness of the two inquiries, because there are different standards of review which we must apply to them.

NEPA is a procedural statute. That is, it represents an attempt by the Congress to force all Federal decision-makers to consider the environmental effects of any major Federal action which they are contemplating. In order to assure that such consideration will in fact occur, the statute in effect lays down some procedural bases which must be touched before an agency may proceed with the substantive implementation of any "major federal action."

The role of the federal courts in dealing with NEPA-based claims is merely to insure that the procedural bases have all been properly touched. We are not to in-

terject our own views on the merits of the federal action being undertaken.[2]

The Supreme Court has warned of the impropriety of federal courts introducing additional procedural or substantive standards into the statutory provisos for administrative action. In *Vermont Yankee Nuclear Power Corp. v. NRDC* [435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)] the Court insisted that even though NEPA established "significant goals for the Nation," the duties it imposed upon agencies were "essentially procedural." NEPA was designed "to insure a fully informed and well-considered decision" by the responsible administrative authority, which could quite conceivably be different from the one preferred by reviewing courts. Given a "fully informed" and "well-considered" decision, an agency decision is entitled to judicial deference; in other words, an informed and deliberate agency decisionmaker is entitled to be arguably "wrong," a court's differing view of wisdom in administration notwithstanding. Obedience to NEPA is a matter of the administrative agency requiring and digesting useful information about the environmental ramifications of major federal projects.

*North Slope Borough v. Andrus*, 642 F.2d 589, 598–9 (D.C.Cir.1980).

What this means in practical terms for the review of an agency action in order to ascertain its conformance with NEPA was defined by the Supreme Court in *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980):

[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken."

█ It is also useful for us to note at this point that the review of an agency's compliance with NEPA must take into account the setting in which the NEPA review takes place. In *Flint Ridge Development Co. v. Scenic Rivers Association*, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 305 (1976), the Court dealt with a claim by plaintiffs that the Department of Housing and Urban Development was required and had failed to prepare an EIS. The statement was necessitated, plaintiffs argued, by the significant environmental effects which would result from the "effectiveness" of a routine statutory filing with HUD by a third-party developer. Under the statute involved, the filing was automatically effective 30 days after its recording with HUD. HUD argued that it would be impossible to prepare and circulate a legally sufficient EIS within the 30-day statutory period. The Supreme Court agreed, holding

where a clear and unavoidable conflict in statutory authority exists, NEPA must give way. As we noted in *United States v. SCRAP*, 412 U.S. 669, 694, [93 S.Ct. 2405, 2419, 37 L.Ed.2d 254] (1973),

**2.** Counsel for the United States has argued that the correct standard which we must apply in reviewing the EIS for conformance with NEPA is the "arbitrary and capricious" standard set forth at 5´U.S.C. § 706(2)(A). This is not the correct standard for review of NEPA claims; it is, as we establish below, the correct standard under which we must review an agency decision to take an action after it has satisfied its responsibility under NEPA. In *Concord Township v. United States*, 625 F.2d 1068, 1073 (3rd Cir. 1980), the Third Circuit ruled that the "arbitrary and capricious" standard applied to the "review of an agency decision to go forward with a major federal action after the agency has prepared and considered an Environmental Impact Statement . . ." The *Concord Township* court did not rule that a court considering an EIS under NEPA is to evaluate the EIS itself under the arbitrary and capricious standard. Likewise, in *Bosco v. Beck*, 475 F.Supp. 1029 (D.N.J.1979) and, more recently, in *Township of Parsippany-Troy Hills v. Costle*, 503 F.Supp. 314 (D.N.J.1979), the courts were reviewing an agency decision *not* to prepare an EIS and applied the arbitrary and capricious standard. Again, they were not reviewing an EIS, but instead were reviewing a discrete and concrete agency decision.

"NEPA was not intended to repeal by implication any other statute."

*Id.,* at 788, 96 S.Ct. at 2438.

B.  *Claims*

In Count I of their complaint, plaintiffs assert that the defendant's approval of the CMP violated NEPA in four general areas.

1.  The Final EIS, issued December 10, 1980, contains legally inadequate discussions of significant changes in the CMP which were enacted after the publication and circulation of the Draft EIS ["DEIS"], issued September 26, 1980. These changes in New Jersey's CMP in the midst of the EIS process, plaintiffs argue, require that defendants prepare and circulate a Supplemental EIS. The complaint charges that this failure violates both NEPA (¶ 62) and the CEQ regulations issued under it. (¶ 63).

2.  The FEIS does not adequately describe and analyze the social and economic impact of the CMP. (¶ 64).

3.  The FEIS is inadequate under NEPA because it does not set forth in sufficient detail the data, methodology and standards upon which its conclusions are based. The FEIS, therefore, plaintiffs charge, is "conclusory." (¶ 65).

4.  Finally, plaintiffs have set forth in great detail the alleged failure of the FEIS adequately to present and discuss alternatives to New Jersey's CMP. Plaintiffs claim that, in general, the FEIS's discussion of alternatives lacks objectivity in that it is biased against all but the proposed action. (¶ 66).

Plaintiffs go on to assert the following inadequacies in the EIS's consideration of alternatives: one, all alternatives other than the CMP were not as rigorously analyzed and examined as the CMP; two, the EIS gives inadequate consideration to an alternative submitted by the Coalition for the Sensible Preservation of the Pinelands; three, the EIS failed to consider the pre-ex-

isting zoning plans throughout the affected area; four, the EIS fails adequately to consider New Jersey's Coastal Zone Management Plan as an alternative for that portion of the area affected by the CMP which is also affected by the CZMP; and five, the EIS fails to consider either the CMP or any of the proffered alternatives at the "site-specific" level, instead performing a more general, or "programmatic" review.

C.  *Discussion*

1.  Inadequate analysis of changes in the CMP.

Plaintiffs assert that the FEIS is inadequate in that it is largely based on New Jersey's draft CMP, filed on August 8, 1980. Between August 8, 1980 and November 21, 1980 when the State's Pinelands Commission adopted the final CMP, there were a number of changes in the State's plan for the management of the Pinelands. Since the federal government's FEIS was finished and released for review on December 12, 1980, plaintiffs argue that it did not adequately respond to and analyze the changes which the State was making in the CMP. Plaintiffs have set forth in greater detail five examples of "major changes" in the CMP which they allege are inadequately analyzed in the FEIS.

■  After taking into consideration the anomalous nature of the project involved here, as well as the timing of events imposed on all parties by the two sets of statutes, we do not believe that the fact that the FEIS is not based on a more finalized or even an ostensibly "final" CMP renders it inadequate under NEPA.[3]

The difficulties created by the nature of the instant scheme must be considered. This mechanism to protect the Pinelands represents a joint effort by two sovereigns. No one would suggest that an FEIS involving a strictly federal decision to build, say, an Army base would be adequate if the

---

**3.**  The FEIS does reflect an awareness of the changes which the State had instituted in the CMP. [4.22a–b]. This awareness may be imputed to the Secretary at the time he performed his review of the FEIS and rendered his ap-

proval of the CMP. While the list of changes is cursory, it does indicate an awareness of the changes by those in charge of drawing up the FEIS.

Department of Defense had not completed its own plans as to the size and design of the base before the EIS was finalized. Here, however, the federal defendant was drawing up an EIS reviewing a proposal designed and subject to review by a separate sovereign, the State of New Jersey. The CMP was being administered by an agency of the State, the Pinelands Commission, and it was being finalized while the EIS process was underway. In order to freeze the CMP for its consideration in a "final" form by the Secretary, the federal government would have had to interfere with the State's pursuit of its own goals.

Such an event could not have occurred, for the simple reason that under the statute, the Secretary was under a duty to review and act upon the final CMP within 90 days of its submission to him. The EIS is the central document upon which the Secretary had to rely in making his approval or disapproval. To await a "final" CMP would have meant that the Secretary would have had no EIS to use in his review, since 90 days simply is not a sufficient time to construct an EIS from the ground up. The Secretary's attempt to draw up the FEIS concurrent with and taking notice of the construction of the final CMP from the draft CMP was, we believe, an entirely acceptable method of accommodating the Secretary's need for an EIS in his 90-day review with the fact that an FEIS could not practically await the State's completion of the CMP.

This conclusion is supported not only by the relevant CEQ regulations, but also by the case law under NEPA. In *Susquehanna Valley Alliance v. Three Mile Island Reactor*, 619 F.2d 231, 241 (3rd Cir. 1980), the Court pointed out that an agency is permitted some flexibility with respect to the timing of the preparation of environmental impact statements. In fact, the Supreme Court's ruling in *Flint Ridge, supra,* appears to control this issue. The Court ruled that "where a clear and unavoidable

4. In light of this holding, we do not need to consider each of plaintiffs' enumerated "significant changes" to determine if they require a

conflict in statutory authority exists, NEPA must give way." *Id.*, at 788. Since the statute involved in our case directs that "[t]he Secretary shall, within ninety days after the date the plan is submitted to him, either approve or disapprove the plan," and since no FEIS could be prepared for the Secretary's use if he is required under NEPA to await a final CMP before drawing up an EIS, it is obvious that he is faced with "a clear and fundamental conflict of statutory duty." *Id.*, at 791. In such a case, *Flint Ridge* directs that "NEPA must give way." Accordingly, insofar as Paragraph 62 of the Second Amended Complaint alleges the inadequacy of the EIS due to its over-reliance on the draft CMP of August 8, 1980 and its underinclusion of any analysis of the changes made by the State in arriving at the final CMP, no claim under NEPA is made out.[4]

2. Failure to discuss socio-economic impact of CMP.

Paragraph 64 of the Second Amended Complaint alleges generally that the EIS is deficient in its discussion of the social and economic effects of the CMP. At the outset, we note that "the fundamental policy questions appropriately resolved in Congress and in the State legislatures are *not* subject to reexamination in the federal courts under the guise of judicial review of agency action." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). In light of this principle, the Fifth Circuit in *South Louisiana Environmental Council v. Sand*, 629 F.2d 1005, 1011 (5th Cir. 1980) held that,

[d]etermination of economic benefits and costs that are tangential to environmental consequences are within this wide area of agency discretion. NEPA, then, permits, at most, a narrowly focused, indirect review of the economic assumptions underlying a federal project described in an impact statement.

supplemental EIS under CEQ regulation 1502.-9(c)(1)(ii).

A review of the FEIS reveals that it does indeed contain discussion and consideration of the socio-economic consequences of the CMP. Such factors as land values [5.40], population trends [G.10], effects on municipal finances [G.11; 5.43–5.54], and the impact of the CMP upon cultural, aesthetic and scenic resources [5.51–6.0] all have a place in the FEIS. Since "there is no doubt that [the Secretary] considered" the socio-economic consequences of the CMP, and since "NEPA requires no more," *Strycker's Bay, supra* 444 U.S. at 228, 100 S.Ct. at 500, summary judgment in the defendant's favor is proper.

3. Inadequate exposition of methodology, standards and data.

■ Plaintiffs' allegation that the FEIS is "conclusory, vague and unsupported by data or analysis," is difficult to understand. Plaintiffs have taken the admissions of incomplete data contained under "Special Considerations" in the FEIS [2.2–3] and expanded them into a charge that the FEIS consists "largely of conclusionary statements and guesswork." [Plaintiffs' Brief, p. 28]. Under Special Considerations, the FEIS noted that "[i]n preparing the Comprehensive Management Plan and this EIS, several factors come into play which have complicated planning and environmental analysis." When the FEIS points out that there exists an "incomplete data base" which results in "incomplete knowledge of cause and effect relationships between land and water uses and their long term and irreversible effects on the Pinelands ecosystem," this does not mean that the Secretary is relieved from having to make a judgment on the CMP. Such considerations are important in light of the CEQ's direction to those who prepare EIS's to "make clear that ... information is lacking or uncertainty exists, due to gaps in relevant information or scientific uncertainty." 40 C.F.R. § 1502.22. These gaps do not relieve the Department of the Interior from its obligation to prepare an EIS, nor do they cripple that preparation. They merely illuminate the quality of the conclusions drawn, providing the decision-maker with the informa-

tion necessary to make proper use of the EIS. *Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292, 1300 (8th Cir. 1976).

In light of the careful and exhaustive analysis and discussion throughout the EIS, and the information which it supplies as to the underlying methodology and data in its tables and bibliography, we do not agree with plaintiffs that the EIS fails to meet NEPA standards in this regard.

4. Inadequate discussion of alternatives.

■ Although this is the most extensively argued of the plaintiffs' various allegations, being set forth in both general (¶ 66, 67a) and specific (¶ 67(b)–(e)) terms, it is, in fact, the least formidable. We note first that "[t]he specificity of EIS treatment of alternatives is a matter of agency discretion." *North Slope Borough, supra* at 601. That case teaches that in reviewing an EIS's discussion of alternatives, a district court is not to dissect the EIS "beyond requiring the agency to take a 'hard look' at the questions of alternative[s]." *Id.* With this as a background, we believe that plaintiffs must do more than merely allege a general failure properly to consider alternatives, in light of an FEIS which analyzes five different alternatives, over 120 pages. This plaintiffs have attempted to do, in the following arguments.

■ 1. Plaintiffs allege that the FEIS's failure to give what they call "substantially equal treatment" to the alternative proposed by one of the plaintiffs, the Coalition for the Sensible Preservation of the Pinelands makes the EIS defective. Chief Judge Fisher, in *Bosco v. Beck, supra* at 1038, found it sufficient when an environmental impact statement "clearly addressed plaintiff's proffered alternative." The FEIS in this case "clearly addressed" plaintiff Coalition's proffered alternative at 4.2–3. This is sufficient under NEPA.

■ 2. Plaintiffs allege the FEIS's failure to discuss a) existing zoning plans in the affected area and b) New Jersey's Coastal Zone Management Plan as alterna-

tives. (¶ 67(b), (b)). Neither of these "alternatives" flaws the FEIS, however. Existing zoning plans were considered per-force in the "No Action" alternative discussed at 4.6–13 and 6.3–26. Furthermore, the existing CZMP is integrated into the proposed CMP, which presupposed the coastal plan. The CZMP is not an independent alternative to the CMP.

■ 3. Plaintiffs allege that the FEIS is deficient in that it fails to contain sufficient "site-specific" analysis of the CMP, opting instead for a largely general, "programmatic" analysis of the CMP. This complaint cannot prevail, for two reasons. First, a reading of the FEIS reveals that it considers the CMP on regional, statewide and local levels. Second, and more important, it is difficult if not impossible for the federal agency here to engage in site-specific analysis of the CMP when it is the State of New Jersey which has enacted and which will choose much of the timing and implementation of the CMP. This differs from the customary situation in which the same federal government which prepares the EIS will be in charge of its "site-specific" implementation. Here, as elsewhere, the FEIS does the best job it can do with this two sovereignty-two plan arrangement.

In evaluating plaintiffs' Count I, we have been aware that our task is

a limited one. Judicial review of an EIS covers only the issue of whether NEPA's procedural requirements have been met, and whether the EIS performs its primary function of presenting the decision-maker with an environmentally-informed choice.

*Save Lake Washington v. Frank*, 641 F.2d 1330, 1334 (9th Cir. 1981). Our review of the FEIS in the light of plaintiffs' allegations of its deficiencies has convinced us that it serves the purposes of NEPA, and that all procedures have been followed. Summary judgment will, therefore, be entered in favor of the defendant on Count I of the Second Amended Complaint.

*Count II*

The second count of plaintiffs' complaint makes the following allegations. Under Section 471i(g)(2) of the National Parks and Recreation Act ["NPRA"], the Secretary is given a list of seven factors which he was to consider in determining whether or not to approve the CMP. These include whether the State has allowed for sufficient public participation in drawing up the CMP; whether the Secretary has received adequate assurances from State and local officials that the CMP will be implemented promptly; whether the plan allows for federal representation; whether the plan requires the use of the police power to the greatest possible extent; whether the plan adequately protects the Pinelands National Reserve; whether the plan provides for continuing State oversight; and whether the plan safeguards the "national defense mission" role of the Pinelands.

First, plaintiffs allege that the State planning entity did not adequately allow for public participation in the design and evolution of the CMP. The complaint sets forth a number of specific instances in which public participation was inadequate. (¶ 71(A)–(F)). Second, plaintiffs allege that the Secretary could not properly have made the determination called for by § 471i(g)(2)(D), in that the CMP allegedly requires the use of the police power to an extent unsupported by state and federal case law.

Third, plaintiffs allege that since there does not exist a complete identity between the boundaries of the protected area as set forth by federal and state legislation, the Secretary cannot have made the finding that there exist adequate assurances of effective implementation of a CMP which, as defined in § 471i(f)(8) must include

[a] program for state and local governmental implementation of the comprehensive management plan in a manner that will insure the continued, uniform, consistent protection of this area in accord with the purposes of this section.

Fourth, the plaintiffs allege that because the Defense Department accepted the CMP

under pressure of promises made by the Secretary of the Interior, that official could not have made the finding required by § 471(g)(2)(G), that

after consultation with the Secretary of Defense, the national defense mission of the military installations within, contiguous or adjacent to the Pinelands National Reserve has been adequately provided for.

Fifth, plaintiffs allege that the Secretary improperly attached "conditions" to his approval of the CMP. These "conditions" consist allegedly of a) the Secretary's procurement of a promise from a state official—the Executive Secretary of the Pinelands Commission—"to submit detailed amendments to the Commission for its consideration." (¶ 75(A)); b) a direction to the Assistant Secretary of the Interior dated in January of this year to furnish "recommendations and guidance" relative to the CMP. Sixth, plaintiffs allege that they are threatened with immediate and irreparable harm "if the defendant is permitted to proceed with the implementation of the purported and unlawful Pinelands CMP" without allowing for adequate public participation.

A. Standard of Review.

█ "Plaintiffs contend that this Court should engage in essentially a de novo review of the [Secretary's approval], assessing for itself whether there has been substantive compliance with the Act. The defendants and intervenor[s] contend that the Court must follow the 'arbitrary and capricious' standard set forth in the A.P.A. The Court agrees that the arbitrary and capricious standard is appropriate ... [T]he Court is not prepared to substitute its views regarding environmental impacts—particularly where subjective value judgments are so entwined with scientific data—unless Congress has made it clear that the Court is to do so. Congress has not so indicated." *Cabinet Mountains Wilderness v. Peterson*, 510 F.Supp. 1186, 1189 (D.D.C.1981) (Gesell, J.).

Plaintiffs' second count is essentially directed at the Secretary's approval of the CMP. The Secretary is directed by statute to review New Jersey's CMP in light of the factors set forth in the statute, and then to approve or disapprove the plan. Plaintiffs argue in Count II that the Secretary's approval of the CMP was improper under the statute.

In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Court was faced with a challenge to the approval by the Secretary of Transportation of a highway construction route. By statute, the Secretary of Transportation was prohibited from authorizing the use of federal funds to finance the construction of highways through public parks if a "feasible and prudent" alternative route was available. The statutes also required the Secretary to determine that "all possible planning to minimize harm" had been performed prior to approval of a route through a park. In *Overton Park*, plaintiffs charged that the Secretary's approval of a highway route did not comport with the statutory requirements.

The Court noted that,

§ 706 of the Administrative Procedure Act, 5 U.S.C. § 706 (1964 ed., Supp. V) ... provides that a "reviewing court shall ... hold unlawful and set aside agency action, findings and conclusions found" not to meet six separate standards. In all cases agency action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if the action failed to meet statutory, procedural, or constitutional requirements.

*Id.*, at 413–4, 91 S.Ct. at 822–823. After pointing out that the Secretary's decision is entitled to a presumption of regularity, *id.*, at 415, 91 S.Ct. at 823,

the Supreme Court noted that the scope of review in this type of case was threefold. The first step in this process is one which requires the district court to decide whether the Secretary acted within the scope of his authority. The second step is a determination of whether or not the actual choice made by the Secretary was arbitrary, capricious, or otherwise not in

accordance with law ... The third and final inquiry by the court is whether or not the Secretary's actions followed the necessary procedural requirement.

*National Center for Preservation Law v. Landrieu*, 496 F.Supp. 716, 724 (D.S.C.1980).

## B. Discussion.

Since plaintiffs' Count I is an attack on the procedural regularity of the Secretary's approval of the CMP, and its accordance with NEPA, the second part of the three-part review laid down by the Court in *Overton Park* has already been done.

As to the first part of the *Overton Park* review, whether the Secretary was within his statutory authority, this admits of no doubt. Section 471i(g) directs the Secretary to review and pass upon New Jersey's CMP. There remains the question whether the Secretary's approval was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.

*Overton Park, supra*, at 416, 91 S.Ct. at 823–824.

1. Public participation. Both the Secretarial Issue Document appended as Exhibit D to the Affidavit of Robert W. McIntosh filed January 26, 1981, and Exhibit A to the Affidavit of Bernard C. Fagan filed April 28, 1981 (which is a table listing the "Pinelands EIS schedule") reflect considered and comprehensive attempts to provide for the maximum amount of public participation which the tight scheduling allowed. Similarly, we believe that given our restricted duty to examine the Secretary's decision for the requisite good faith consideration and determination of the factors set forth at § 471i(g), there is in the record a sufficient basis for the Secretary's determination that "[t]he plan requires the exercise of police power responsibilities to the greatest extent practicable in the regulation of land and water resources use." (Finding # 4, Secretarial Issue Document).

Plaintiffs argue that precedent will not support the exercise of the police power in the manner envisioned by the CMP but like the court in *Save Lake Washington, supra*, at 1337,

[w]e reiterate our very limited role in the process of reviewing the [Secretary's] decision. The ultimate conclusion ... may well be a blunder, but we have served our purpose under NEPA by assuring that it was a "knowledgeable blunder." *Matsumoto v. Brinegar*, [568 F.2d 1289, 1290 (9th Cir. 1978)]. There was in the record a sufficient basis for the [Secretary's] decision. We find that the ... decision was neither arbitrary nor capricious.

2. Differing boundaries. Plaintiffs' allegations of boundary differences between the state and federal laws does not amount to a factor which would render the Secretary's decision arbitrary and capricious. Whatever the ultimate problems which may or may not be created as a result of such boundary differences, the Secretary did, apparently, consider such factors in his determination that,

[t]here have been adequate assurances from appropriate State officials that the plan's implementation will be initiated within a reasonable time.

Adequate assurances that the plan's implementation program will insure effective implementation of the State and local aspects of the plan.

(Findings 2(a) and 2(b), Secretarial Issue Document).

3. National Defense. Similarly, plaintiffs' allegations in Paragraphs 74 and 75 of the Second Amended Complaint revolve around the requirement contained in § 471i(g)(2)(G) that in his review of the CMP the Secretary was to consider whether:

after consultation with the Secretary of Defense, the national defense mission of the military installations within, contiguous or adjacent to the Pinelands National Reserve has been adequately provided for.

Paragraph 74 of the complaint alleges generally that the CMP does not provide adequately for the national defense mission, and claims that the Secretary of the Interior approved the CMP after overriding the strenuous objections of Defense Department personnel. Paragraph 75 expands on the allegations, claiming that the defendant obtained Defense Department acquiescence in the CMP by means of an improper "conditional approval" of the CMP.

At the outset, we note that the defendant has properly drawn our attention to the questionable nature of plaintiffs' standing to raise these issues. Section 471i(g)(2)(G) simply requires the Secretary of the Interior to consult with the Secretary of Defense and to analyze the CMP's effects on the "national defense mission." If the Secretary's actions under sub-section (G) were not proper, it would logically be the Secretary of Defense who would be the proper party to raise the issue. Only the broadest view of plaintiffs' status as citizens interested in a strong and vigorous national defense could lump plaintiffs' interests "arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). However, since we believe that plaintiffs can not prevail on the merits of this argument, we do not think that it is necessary to bar them on the basis of lack of standing.

Even assuming plaintiffs have the standing to raise these issues, the statute only requires Secretarial consultation and a finding by the defendant that the national defense mission is provided for. There is ample evidence in the record of these activities. (Appendix C(1) to McIntosh affidavit; page 7 of Secretarial Issue Document) for us to find that the Secretary made the requisite good faith, proper effort to comport with sub-section (G)'s requirements.

Furthermore, even if we assume what the plaintiffs have never shown, the impropriety of a "conditional approval," this allegation does not undermine the defendant's approval of the CMP. Plaintiffs claim that the Secretary's "commitment to submit [certain] indicated amendments to the Pinelands Commission for consideration within six months of the effective date of the CMP" and the defendant's direction to his Assistant Secretary of the Interior to provide additional recommendations and guidance to the Pinelands Commission on implementation of the CMP render his approval of the CMP "conditional." No evidence has been presented to indicate that the Secretary's act of approval was in any way *conditioned* upon acceptance by others of these actions; the record indicates that they merely accompanied it. For instance, while Exhibit C(1) to the McIntosh affidavit may suggest that the withdrawal of Defense Department objections to the CMP may have been conditioned upon the defendant's agreement to submit amendments to the Pinelands Commission, there is no indication that the defendant himself so conditioned his own approval of the CMP.

■ Accordingly, we find that there is ample evidence in the record to support the Secretary's finding that the CMP adequately provided for the national defense mission, and that therefore, his approval of the CMP on these grounds was neither arbitrary nor capricious. Therefore, summary judgment will enter in favor of the defendant on Count II of the complaint.

*Count III*

The defendant has argued that we should abstain from the exercise of our jurisdiction over Count III of the complaint on the basis of *Pullman* abstention. *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). As defined recently by the Third Circuit in *Kennecott Corp. v. Smith*, 637 F.2d 181, 184–5 (3rd Cir. 1980),

> [t]he *Pullman* doctrine is derived from the policy that whenever possible the judiciary should resolve a matter on state law grounds if such bases for decision would obviate the need to reach a federal constitutional question . . .

When it is necessary to resort to construction of an ambiguous or unsettled state provision to determine whether state law will enable a court to avoid a constitutional issue, *Pullman* admonishes federal courts to abstain from resolving the state question. In such circumstances the state courts should be given the opportunity to construe their own laws ... The type of state question that usually triggers *Pullman* abstention is presented when "the unsettled issue of state law principally concern[s] the *applicability of the challenged [state] statute to a certain person or a defined course of conduct,* whose resolution in a particular matter would eliminate the constitutional issue and terminate the litigation." *Baggett v. Bullitt,* 377 U.S. 360, 376–77 [84 S.Ct. 1316, 1325–1326, 12 L.Ed.2d 377] ... (1964) (emphasis added).

It seems to us that Count III of plaintiffs' complaint is an appropriate instance for the Court to abstain from the exercise of its jurisdiction on the basis of the *Pullman* doctrine. Count III alleges that the State's CMP as written and as it will be applied due to the Secretary's approval of the CMP, works a "taking without just compensation" in derogation of the plaintiffs' Fifth and Fourteenth Amendment rights.

We note that several of the plaintiffs and their affiants are pursuing their rights of appeal from Pinelands Commission determinations through the state judicial system. (Affidavit of William F. Harrison, filed March 31, 1981). We also note that there is a parallel action in the state court system, filed by a number of our plaintiffs, *Township of Folsom, et al. v. State of New Jersey,* Docket Number A–1675–80T2 (App. Div. January 7, 1981). Surely under *Pullman,* these state judicial and administrative proceedings are the proper arena in which plaintiffs must originally make their attacks on this unsettled piece of state legislation and its progeny, the CMP. A properly filed *England* reservation will preserve plaintiffs' constitutional claims for later review by this Court, should that be necessary.

Accordingly, summary judgment will be entered in favor of the defendant on Counts I and II of the Second Amended Complaint, and we will abstain from the exercise of our jurisdiction over Count III, in reliance on the *Pullman* doctrine.

The Court will enter an appropriate form of order.